**Opinion filed August 23, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00306-CV

_____

**CAREFLITE, Appellant**

**V.**

**RURAL HILL EMERGENCY**
**MEDICAL SERVICES, INC., Appellee**

**On Appeal from the 66th District Court**
**Hill County, Texas**
**Trial Court Cause No. 47,865**

### O P I N I O N

CareFlite sought a writ of mandamus against Rural Hill Emergency Medical Services, Inc., seeking to compel Rural Hill to produce information requested under the Texas Public Information Act (TPIA), TEX. GOV'T CODE ANN. ch. 552 (West 2012). Rural Hill filed a general denial and a counterclaim under the Uniform Declaratory Judgments Act[1] (UDJA) in which it sought attorney's fees and a declaration that Rural Hill is not a governmental body as set forth by and subject to the TPIA. Both sides moved for summary judgment. The trial court granted Rural Hill's motion and denied CareFlite's motion. The trial court then severed the summary judgment from a second, unrelated suit that had been consolidated into the cause of action and

---

[1]TEX. CIV. PRAC. & REM. CODE ANN. ch. 37 (West 2008).

rendered a final order in which it disposed of all claims and parties in the action that were the subject of the first suit.

CareFlite contends in two issues that (1) the trial court erred when it granted summary judgment and attorney's fees for Rural Hill on a declaratory judgment counterclaim that did nothing more than assert a defense to CareFlite's right to mandamus relief and (2) the trial court erred in granting summary judgment for Rural Hill and denying summary judgment for CareFlite when the undisputed facts show that Rural Hill was supported in whole or in part by public funds, thereby making it a governmental body subject to the disclosure requirements of the TPIA. We affirm.

Rural Hill is a not-for-profit corporation that provides emergency medical transportation and related services exclusively in Hill County. It has contracts with the cities of Mt. Calm and Hubbard to make those services available twenty-four hours a day, seven days per week. Rural Hill derives its revenue in three ways: (1) monthly payments from the City of Mt. Calm; (2) monthly payments from the City of Hubbard; and (3) payment from the patients for whom it renders specific medical transportation and related services. The monthly payments Rural Hill receives from each of the cities are calculated according to a formula set forth in each city's respective contract. In addition to the monthly payment, the contract between Rural Hill and the City of Hubbard also provides that the city will provide Rural Hill with a facility and utilities. Several years after the contract's execution, Rural Hill moved into its own building, at which point the City of Hubbard began to pay Rural Hill an additional monthly payment of $800 in lieu of providing the facility and utilities.

CareFlite is also a not-for-profit provider of emergency medical services. Through its attorney, CareFlite sent a letter to Rural Hill requesting, pursuant to the TPIA, that Rural Hill produce the following documents: "(1) financial records (balance sheets, income statements, listings of expense, and collections), (2) standard service rates, (3) actually billed rates or charges for any and all services, and (4) tax returns and schedules, including Form 990's." When Rural Hill did not produce the requested information and did not request a ruling concerning the request from the attorney general, CareFlite filed a petition for writ of mandamus, in which it asked the trial court to compel Rural Hill to provide the information.

Both of the motions for summary judgment were traditional ones. TEX. R. CIV. P. 166a(c). We review the trial court's summary judgment de novo. *Valence Operating*

2

*Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A trial court must grant a traditional motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Rule 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). In order for a defendant to be entitled to summary judgment against the plaintiff's claims, it must either disprove an element of each of the plaintiff's causes of action or establish an affirmative defense as a matter of law. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

Once the movant establishes a right to summary judgment, the nonmovant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). When reviewing a traditional summary judgment, the appellate court considers all the evidence and takes as true evidence favorable to the nonmovant. *Am. Tobacco Co.*, 951 S.W.2d at 425; *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). The appellate court "must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented" and may not ignore "undisputed evidence in the record that cannot be disregarded." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755, 757 (Tex. 2007).

When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides and determine all questions presented. If we determine that the trial court erred, we must render the judgment that the trial court should have rendered. *Valence Operating*, 164 S.W.3d at 661. When a trial court does not specify the grounds it relied upon to grant the summary judgment, we must affirm the summary judgment if any of the grounds stated in the motion for summary judgment are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000).

In its second issue, CareFlite maintains that the trial court erred when it granted Rural Hill's motion for summary judgment and denied its motion for summary judgment. It contends Rural Hill is a governmental body subject to the TPIA. CareFlite bases its argument, in part, on the proposition that Rural Hill was supported in whole or in part by public funds because the contracts Rural Hill had with the cities were not arms-length transactions. It additionally argues that Rural Hill comes under the TPIA for two reasons: first, because the services contemplated

3

by the contracts traditionally have been provided by government and, second, because Rural Hill and the cities have a common objective or purpose.

We begin our analysis of the matters set forth in CareFlite's second issue with a recognition that the underlying purpose of the TPIA is to provide transparency in governmental affairs. Thus, the TPIA begins in Section 552.001:

> (a) Under the fundamental philosophy of the American constitutional form of representative government that adheres to the principle that government is the servant and not the master of the people, it is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. The provisions of this chapter shall be liberally construed to implement this policy.

> (b) This chapter shall be liberally construed in favor of granting a request for information.

CareFlite filed its original petition for writ of mandamus, in which it sought an order to compel Rural Hill to produce information under the TPIA. Section 552.321(a) provides, in pertinent part, "A requestor . . . may file suit for a writ of mandamus compelling a governmental body to make information available for public inspection if the governmental body refuses to request an attorney general's decision . . . or refuses to supply public information." In response to CareFlite's petition, Rural Hill filed a counterclaim in which it sought a declaration that it was not a governmental body subject to the TPIA. Rural Hill asserts that it is not subject to the TPIA and, therefore, is not required to provide CareFlite with the information it requested. Rural Hill specifically bases its assertion that it is not subject to the TPIA on its claim that it is not a governmental body as defined by the TPIA.

The TPIA contains provisions that pertain to the required disclosure of certain information by a governmental body when that governmental body is requested to do so in accordance with the TPIA. Our concern in this case is whether Rural Hill is a governmental body.

There are several definitions of "governmental body" within the TPIA, but the only one that is at issue in this appeal is this one that makes an entity a governmental body as to: "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency

4

that spends or that is supported in whole or in part by public funds." Section 552.003(1)(A)(xii). "'Public funds' means funds of the state or of a governmental subdivision of the state." Section 552.003(5).

It is undisputed that Rural Hill receives public funds. We have set forth the sources of Rural Hill's revenue earlier in this opinion, and a portion of that revenue comes from public funds supplied by the City of Hubbard and the City of Mt. Calm.

But, the fact that Rural Hill receives public funds does not make it a governmental body under the TPIA automatically. To be considered a governmental body, the public funds that it receives must be the type of "support" that places Rural Hill within the purview of the TPIA.

Neither our research nor that of either party has uncovered an opinion published by a Texas court that directly addresses the definition of "support" under the TPIA. However, in 1988, the United States Court of Appeals for the Fifth Circuit addressed this issue in *Kneeland v. National Collegiate Athletic Association*, 850 F.2d 224 (5th Cir. 1988). In *Kneeland*, the court analyzed similar language of the TPIA predecessor, the Texas Open Records Act (TORA). 850 F.2d at 228. Like this court, the Fifth Circuit noted that there were no Texas cases directly on point. *Id.* To inform its decision, the court looked to formal opinions of the Texas Attorney General. *Id.* Then, with the TORA, as now, with the TPIA, the Texas Attorney General is charged with issuing opinions concerning its interpretation of the provisions of the act when requested. *Id.*; Section 552.301. A review of the applicable formal opinions by the Texas Attorney General will inform our decision here.

In Open Records Decision No. 228, the attorney general was called upon to determine whether the North Texas Commission was a governmental body for purposes of the TORA. TEX. ATT'Y GEN. OR1979-228 (ORD-228). The North Texas Commission was a nonprofit corporation that was chartered to promote the interest of the Dallas-Fort Worth metropolitan area. *Id.* The City of Fort Worth contracted with the North Texas Commission to provide that promotion, and it agreed to pay the commission $80,000 for three years. *Id.* It was the attorney general's opinion that the phrase "supported in whole or in part by public funds" applied to an agreement between a political subdivision and any "organization, corporation, commission, committee, institution, or agency" whereby public funds are transferred from the political subdivision to any such entity but which does not "[impose] a specific and definite obligation on the [entity] to provide a measurable amount of service in exchange for a certain amount of

5

money as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.*

The attorney general concluded that the contract between the City of Fort Worth and the commission did not impose a "specific and definite obligation on the Commission to provide a measurable amount of service in exchange for a certain amount of money." *Id.* In essence, the City of Fort Worth and the commission had not entered into an arms-length transaction. *Id.* Therefore, the City of Fort Worth was providing for the general support of the commission with public funds, and the commission was a governmental body subject to the TORA. *Id.*

In 1982, the attorney general issued Open Records Decision No. 302. TEX. ATT'Y GEN. OR1982-302 (ORD-302). There, the question was whether the Brazos County Industrial Foundation was a governmental body subject to the TORA. *Id.* The foundation was a nonprofit corporation that, in part, had a focus on rendering "aid to manufacturing and industrial enterprises situated in [Brazos County], and to induce the location in said County of other manufacturing and industrial establishments." *Id.*

In ORD-302, the attorney general compared the Brazos County Industrial Foundation with the North Texas Commission in ORD-228. *Id.* The Brazos County Industrial Foundation had received an unrestricted grant of $48,000 from the City of Bryan. *Id.* It was the attorney general's opinion that this grant was no different than the relationship considered in ORD-228; in essence, the transaction was not an arms-length one. *Id.* Thus, the Brazos County Industrial Foundation was a governmental body and subject to the TORA. *Id.*

Ambulance activity reports of Amarillo Medical Service were, in part, the subject of Attorney General Open Records Decision No. 343. TEX. ATT'Y GEN. OR1982-343 (ORD-343). Amarillo Medical Service was a private, nonprofit corporation. *Id.* It entered into a contract with Amarillo Hospital District to furnish transportation and emergency services to persons who used the district's facilities. *Id.* The attorney general noted that the contract required Amarillo Medical Service to perform specific duties. *Id.* In return, Amarillo Medical Service was to receive "each month a sum equal to the differences between cash receipts and approved operating expenditures" of Amarillo Medical Service. *Id.* The opinion of the attorney general was that the agreement between the district and Amarillo Medical Service imposed "a definite obligation 'to provide a measurable amount of service in exchange for a certain amount of money.'" *Id.* Essentially, then, the district and Amarillo Medical Service had entered into an

6

arms-length transaction, and Amarillo Medical Service was not "supported in whole or in part by public funds" and was, therefore, not a governmental body subject to the TORA. *Id.*

In Opinion No. JM-821, the attorney general cautioned against relying on the outcome in the Amarillo Medical Service case. TEX. ATT'Y GEN. OP. No. JM-821 (1987). It disagreed with the outcome of that opinion because a close reexamination of the contract in that decision showed that the hospital district (a governmental body) there was to provide ambulances and to pay for the general monthly operating expenses of Amarillo Medical Service. *Id.* Additionally, district approval was required before the service could make expenditures or hire personnel. *Id.* We note that those factors are not involved in the contracts between the cities and Rural Hill.

The inquiry in Attorney General Opinion No. JM-821, to which we just referred, was whether the Cy-Fair Volunteer Fire Department, a nonprofit corporation, was subject to the TORA as a governmental body. *Id.* The department received public funds by virtue of a contract with the Harris County Rural Fire Prevention District No. 9. *Id.* In return, the department was to perform fire-fighting services within the district. *Id.* The attorney general noted that the main issue in this type of case is whether the private entities "are supported in whole or in part by public funds or whether they expend public funds." *Id.*

Under the contract between the Cy-Fair Volunteer Fire Department and the Harris County Rural Fire Prevention District No. 9, the bulk of the funds received by the district from tax collections, less costs associated with administration, were transferred by the district to the department. *Id.* The attorney general opined that the manner of funding was not the sole dispositive issue to be examined when determining whether an entity is subject to the TORA. *Id.* Other issues might include whether there is a common objective or purpose, whether an agency-type relationship is created (although as noted in footnote 1 of its opinion, the agency is not the same as that in tort responsibility), and whether the services provided under the contract are traditionally provided by governmental bodies. *Id.* However, "[t]he overall nature of the relationship created by the contract is relevant in determining whether the private entity is so closely associated with the governmental body that the private entity falls within the Open Records Act." *Id.*

The attorney general also noted that volunteer firefighters have a closer relationship with governmental bodies than others. *Id.* For instance, by statute, political subdivisions may provide workers' compensation coverage and may provide relief and retirement benefits. *Id.* Further, it

7

was noted in the opinion that the legislature may provide benefits to survivors of a volunteer firefighter killed in the performance of "official duties." *Id.* (citing TEX. CONST. art. III, § 51-d). These provisions, according to the attorney general, make it more probable that a volunteer fire department will come under the TORA. *Id.* Nonetheless, according to the attorney general, the answer to the inquiry depends upon the circumstances of each case. *Id.*

The contract between the Cy-Fair Volunteer Fire Department and the Harris County Rural Fire Prevention District No. 9 provided: "The Department will provide the emergency ambulance services, the fire prevention services, the fire fighting services in the geographic District and will not look to the District to provide any services whatsoever except for the providing of funds to enable the Department to carry on its duties and responsibilities." *Id.* The contract required that the department submit one-year operating budgets and a three-year capital expenditure budget for planning purposes and provided for continuing annual renewals. *Id.* There is no indication in the opinion that the department received funds from any source other than the district. *Id.* It was the opinion of the attorney general that the contract involved the general support of the department's activities with public funds and that it was subject to the TORA. *Id.*

In another attorney general opinion, LO-93-55, the attorney general responded to the issue of whether certain chamber of commerce subdivisions were governmental bodies subject to the Open Meetings Act. TEX. ATT'Y GEN. LO-93-55 (1993); *see* TEX. GOV'T CODE ANN. ch. 551 (West 2012). In the course of answering that question, the attorney general noted that the term "governmental body" was defined differently in the Open Meetings Act than in the Open Records Act. LO-93-55. The Open Meetings Act did not contain a provision similar to the one in the Open Records Act that included within its definition of "governmental body" as "the part, section, or portion of every organization, corporation, commission, committee, institution, or agency which is supported in whole or in part by public funds, or which expends public funds." *Id.* Therefore, while the chamber of commerce subdivisions might receive public funds and not fall within the purview of the Open Meetings Act, the attorney general opined that the subdivisions could fall under the Open Records Act to the extent that they received public "funds from a governmental body (and such funds do not constitute a *quid pro quo*)." *Id.*

In its opinion in *Kneeland*, the Fifth Circuit explained that, in its review of the Texas Attorney General opinions, it perceived "three distinct patterns of analysis" in regard to this

8

issue. *Kneeland*, 850 F.2d at 228. First, "an entity receiving public funds becomes a governmental body under the Act, unless its relationship with the government imposes 'a specific and definite obligation . . . to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser.'" *Id.* (quoting Opinion No. JM-821). Second, "a contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship between a private entity and a public entity will bring the private entity within the . . . definition of a 'governmental body.'" *Id.* Finally, "some entities, such as volunteer fire departments, will be considered governmental bodies if they provide 'services traditionally provided by governmental bodies.'" *Id.*

We do not disagree with the "patterns" or issues that the Fifth Circuit gleaned from a study of the attorney general opinions, but we believe that there are sub-patterns or sub-issues within each pattern or issue. We also believe that no one sub-pattern or sub-issue in and of itself is dispositive of the main pattern or issue of whether a particular entity, in a particular circumstance, is or is not a governmental body. We believe that the overarching consideration is, in these sub-issues, as indicated by the attorney general in Opinion No. JM-821, whether the overall nature of the relationship created by the contract is such that the private entity is "so closely associated with the governmental body that the private entity falls within the Open Records Act." Opinion No. JM-821. The answer to the inquiry depends upon the circumstances of each case. *Id.* And, if it is determined that public funds are for the general support of the private entity, the entity is subject to the TPIA. *Id.* (citing ORD-228).

We will take CareFlite's arguments each in turn with an eye toward the stated purpose of the TPIA and the various standards set forth in the attorney general opinions. As we do that, we do so realizing that no one standard or sub-pattern or sub-issue is dispositive and that it is relevant to look at the circumstances of this case on an individual basis to determine whether Rural Hill is "so closely associated with the governmental body that the private entity falls within the Open Records Act." Opinion No. JM-821.

CareFlite argues that the contracts between the cities and Rural Hill do not provide for an arms-length commercial services contract as would normally exist between a vendor and a purchaser. CareFlite advances four reasons in support of its argument.

9

We will address CareFlite's first and third arguments under its second issue on appeal together. First, CareFlite maintains that the contracts between Rural Hill and each of the cities do not impose "a specific and definite obligation" on Rural Hill "to provide a measurable amount" of emergency medical services. *Kneeland*, 850 F.2d at 228. In its third argument, CareFlite essentially takes the position that the services that Rural Hill provides are "in exchange" for the payments from its patients, not the cities' public funds and that, therefore, there is no quid pro quo.

We agree that Rural Hill does provide services to its patients in exchange for the payments it receives from them. However, the contracts between Rural Hill and the cities also list additional specific services that Rural Hill is obligated to provide in exchange for the payments it receives from the cities. For example, the contracts obligate Rural Hill to "[a]ssure [Rural Hill] and its personnel are appropriately trained, licensed, and certified for the levels of service provided" and "[a]ssure . . . that qualified personnel are available to respond to each emergency call on which [Rural Hill] is dispatched." The services that Rural Hill is to provide to the cities under its contracts, as far as the cities are concerned, are not solely the individual emergency responses but also include continuous emergency services supported with adequate equipment and adequately trained and qualified personnel, the minimum standards of and for which are stated in the contracts. Additionally, these minimums should be readily ascertainable from industry standards. We believe that this constitutes a sufficient quid pro quo as is referred to in LO-93-55. Therefore, we disagree with CareFlite's first and third arguments under its second issue on appeal.

In its second argument under its second issue on appeal, CareFlite maintains that, because the contracts set the amount of payment to Rural Hill at an amount that is based on annually appraised property values, which may fluctuate, the services are not in exchange for a "certain amount of money." The Hubbard contract provides the following:

> The length of this agreement is for a five year term with monies for the first year to be calculated based on $.07 per 100 dollars taxable value for the City of Hubbard and its [extra territorial jurisdiction]. This amount of monies will be calculated each year of this contracts [sic] term on the date set forth by the Hill County Appraisal District on which the Hill County Appraisal District certifies the tax role. For each additional year the amount is not to exceed $32,000 per year unless agreed upon by the council for the City of Hubbard during the annual budget process.

10

The Mt. Calm contract contains similar language.

Because appraised property values fluctuate, CareFlite argues, the contracts do not require the cities to provide Rural Hill with a certain amount of money. Therefore, asserts CareFlite, Rural Hill does not meet that part of the criteria for an arms-length transaction.

Rural Hill argues that the potential fluctuation under the contracts do not mean that the contracts fail to require payment of a certain amount of money. Rather, drawing the comparison to an attorney working under a contingent fee agreement, Rural Hill argues that, although the revenue may fluctuate, the amount is discernible against a measurable baseline.

Neither party cites to any source to support its arguments of what qualifies as a "certain amount of money." After the *Kneeland* court reviewed three attorney general opinions where the contractual obligations imposed were not specific enough to fall under the exception, the court discussed ORD-343 in which an obligation to provide specific measurable services in exchange for a specific payment was found.[2] *Kneeland*, 850 F.2d at 229. In its examination of the attorney general's opinion and conclusion that the challenging entity, an ambulance service, was not a governmental body, the court noted that a formula was used to determine payment under the contract. *Id.* In exchange for its services, the challenging entity received "each month a sum equal to the difference between cash receipts and approved operating expenditures of the ambulance service." *Id.* (quoting ORD-343). Because the contracts in this case provide a formula for determining the exact amount Rural Hill is to be paid, we hold that the contracts do provide for the payment of a "certain amount of money." We disagree with CareFlite's argument to the contrary.

In its fourth argument under its second issue on appeal, CareFlite maintains that the contracts do not constitute an arms-length transaction because the contracts' provisions providing for the cities' review of Rural Hill's budget and for the City of Hubbard's supplying free rent and utilities are not what "would be expected in a typical arms-length contract for services." Both of the cities' contracts specify that Rural Hill will "[p]rovide the city with a quarterly budget and service report to the council and verbal reports as requested."

---

[2]As discussed supra, the attorney general has cautioned against relying on ORD-343's outcome. In *Kneeland*, the court recognized this as well, but explained that the caution is based on the attorney general's reappraisal of the facts of ORD-343—specifically, "that the ambulance service could not make expenditures or personnel decisions without approval of the public body"—not because of its exposition of the law. *Kneeland*, 850 F.2d at 231.

11

In support of this part of its argument that this is not typical of an arms-length contract, CareFlite directs us to the Cy-Fair Volunteer Fire Department opinion that we have discussed above. Opinion No. JM-821. CareFlite specifically points to the fact that the department's contract required it to provide the governmental entity with "one-year operating budgets and a three-year capital expenditure budget for planning purposes." *Id.* In our examination of the opinion, we note that the contract there provided that the funds were provided "to enable the Department to carry on its duties and responsibilities" and that the department received public funds to provide *all* of the district's needed services. We also note the particular distinction given to volunteer fire departments generally as referenced by the attorney general. Rural Hill, however, received about eighty percent of its funds from its patients and performed services other than emergency services that were outside the scope of the contracts it had with the cities.

Additionally, CareFlite argues that the contract cannot be an arms-length transaction because the City of Hubbard agreed to supply free rent and utilities and that such an agreement would not be expected in a typical arms-length contract for services. We have found no authority that requires that a governmental body's part of a quid pro quo be satisfied exclusively with dollars. Consideration can take many forms. *See generally Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (discussing consideration). In any event, we do not find the form of consideration to be solely dispositive of the "arms-length transaction" issue.

Our review of this case in light of the attorney general opinions that we have discussed leads us to hold that the transactions between the cities and Rural Hill were arms-length ones. The contracts imposed upon Rural Hill the obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser.

In its second issue, CareFlite presents other arguments not related to its arms-length transaction ones. CareFlite argues that Rural Hill comes within the definition of a governmental body because both the cities and Rural Hill share the "common purpose or objective" of locally providing emergency medical services to residents. *See Kneeland*, 850 F.2d at 228.

CareFlite additionally argues in Issue Two that emergency medical services are "services traditionally provided by governmental bodies" and that, therefore, Rural Hill should be considered a governmental body under the TPIA. *See Kneeland*, 850 F.2d at 228. In support of this argument, CareFlite directs our attention to a 2003 Attorney General Open Records Letter

Ruling, which noted "that emergency medical services are 'traditionally provided by governmental bodies.'" TEX. ATT'Y GEN. OR2003-2402 (ORD-2402) (quoting Opinion No. JM-821).

CareFlite has not directed us to, and we have not found, any authority, primary or persuasive, that stands for the proposition that, if a private entity and a governmental body share a common purpose or objective, the private entity is automatically a governmental body for purposes of the TPIA. Neither are we aware of any like authority when an entity provides services traditionally provided by governmental bodies. Nor, with the modern changes in the way emergency services are delivered, can we say categorically that emergency medical services are traditionally provided by governmental bodies. In ORD-2402, the attorney general does not include the statement "that emergency medical services are 'traditionally provided by governmental bodies'" in its analysis of the facts or its conclusion. We are aware, however, of the statements of the attorney general that each situation is to be examined on a case-by-case basis and that the overall nature of the relationship is relevant in a determination of whether a private entity is a governmental body for purposes of the TPIA. Opinion No. JM-821. Because the contracts imposed upon Rural Hill the obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser and because we are not persuaded that CareFlite's other arguments show that the overall nature of the relationship created by the contracts is such that Rural Hill is "so closely associated with the governmental body that [it] falls within the [TPIA]," we hold that the trial court was correct in its determination that Rural Hill was not a governmental body and, therefore, not subject to the TPIA. Issue Two is overruled.

In its first issue, CareFlite complains that the trial court erred when it granted Rural Hill's motion for summary judgment. It argues that Rural Hill could not obtain a judgment under the UDJA when it sought nothing more than a favorable ruling on a defense to CareFlite's right to mandamus relief. However, seeking declaratory relief that an entity is not a governmental body as set forth under the TPIA and mandamus relief under the same are not mutually exclusive. *See, e.g.*, *Blankenship v. Brazos Higher Educ. Auth., Inc.*, 975 S.W.2d 353 (Tex. App.—Waco 1998, pet. denied). CareFlite is correct in its assertions that, generally, a UDJA counterclaim may not be asserted on a claim already pending before the court, *Staff Industries, Inc. v.*

13

*Hallmark Contracting, Inc.*, 846 S.W.2d 542, 547 (Tex. App.—Corpus Christi 1993, no writ), nor may a UDJA counterclaim be creatively asserted to contend that a plaintiff cannot make out an element of its case or to state a defense to a plaintiff's case. *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990). However, "when a declaratory judgment counterclaim has greater ramifications than the original suit, the court may allow the counterclaim." *BHP Petroleum*, 800 S.W.2d at 842 (quoting *Winslow v. Acker*, 781 S.W.2d 322, 328 (Tex. App.— San Antonio 1989, writ denied). Here, Rural Hill sought a declaration of its rights and interests under both the TPIA and the contracts by which it received payment for services rendered to the City of Hubbard and the City of Mt. Calm. Although the resolution of the declaration that Rural Hill sought does provide a defense to the action CareFlite brought, that is not its only effect. The trial court's determination that, based on the evidence before it—including the contracts between Rural Hill and the cities—Rural Hill is not a governmental entity under the TPIA has the additional foreseeable effect of defining Rural Hill's status under the TPIA so long as its revenue conditions remain the same. Because Rural Hill's counterclaim has greater ramifications than CareFlite's original suit, we hold that the trial court did not err when it granted Rural Hill's motion for summary judgment and awarded attorney's fees under the UDJA. *Id.* Issue One is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE


August 23, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

14