Opinion filed April 11, 2013



## In The

# 𝕰leventh Court of 𝕬ppeals

_____

### No. 11-11-00112-CV
_____

### WASTE MANAGEMENT OF TEXAS, INC., Appellant

### V.

### GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF TEXAS; COUNTY OF WILLIAMSON; AND KURT E. JOHNSON, Appellees

**On Appeal from the 261st District Court**

**Travis County, Texas**

**Trial Court Cause No. D-1-GN-09-004107**

### O P I N I O N

Kurt E. Johnson made an open records request to Williamson County for certain waste tickets related to the operation of the Williamson County Landfill. Waste Management of Texas, Inc., the operator of the landfill, brought this suit against Greg Abbott, in his official capacity as Attorney General of the State of Texas, and Williamson County, seeking declaratory and injunctive relief under the Texas Public Information Act (TPIA) to prevent the disclosure of

information that is contained in the waste tickets. *See* TEX. GOV'T CODE ANN. §§ 552.001–.353 (West 2012). In its petition, Waste Management alleged that the information constituted a trade secret and that, as such, the information was excepted from disclosure under the TPIA. Johnson intervened in the suit. Following a bench trial, the trial court entered a judgment in which it denied relief to Waste Management and ordered Williamson County to disclose the information in the waste tickets to Johnson. Waste Management appeals from the trial court's judgment. We reverse and render.

*Background*

Appellee Williamson County owns the Williamson County Landfill. Waste Management operates the Williamson County Landfill under the terms of a Landfill Operation Agreement (LOA) between it and Williamson County. Waste Management negotiates and enters into contracts with parties relating to the disposal of waste in the landfill. Williamson County is not a party to these contracts.

When a customer disposes of waste at the landfill, Waste Management generates a waste ticket. Waste Management refers to the tickets as "waste" tickets. The LOA refers to the tickets as "weigh" tickets, as does the Attorney General in his brief. For consistency purposes, we will refer to the tickets as "waste" tickets throughout this opinion.

The waste tickets generally include, among other information, the name of the customer and the volume of waste, measured in tons, disposed of by the customer at the landfill. Some of the waste tickets also include pricing information. These waste tickets show the rate per ton charged to the particular customer and the disposal fee charged to the customer. Thus, the pricing information in these tickets includes rate and fee information. Waste Management maintains the waste tickets. Pursuant to the terms of the LOA, Williamson County has a right of access to the tickets.

On August 11, 2009, Williamson County received a letter from Appellee Johnson in which he requested "the sequentially-numbered tickets showing the individual loads of solid-waste disposal events at the Williamson County Landfill for the full business day of July 14, 2009." In response, Williamson County requested an open records decision from the Attorney General and provided Waste Management notice of Johnson's request. Waste Management submitted a letter brief and a representative sample of waste tickets to the Attorney General's office. Waste Management argued that some of the information in the waste tickets, including

2

customer names, the volume disposed of by the customer, and the pricing information, constituted trade secrets. Therefore, Waste Management asserted that the information was excepted from disclosure under Section 552.110(a) of the TPIA. Waste Management also argued that disclosing the information would cause it to suffer substantial competitive harm. As such, Waste Management asserted that the information was excepted from disclosure under Section 552.110(b) of the TPIA.

On November 5, 2009, the Attorney General's Office issued an open records decision in this case. *See* TEX. ATT'Y GEN. OR2009-15816. In the decision, the Attorney General ruled that the customer identity information in the subject waste tickets constituted a trade secret and that, therefore, it was excepted from disclosure under Section 552.110(a). The Attorney General also ruled that Waste Management had not established that the volume information and pricing information in the tickets constituted trade secrets or that disclosure of such information, without also disclosing customer identities, would cause substantial competitive harm to it. Therefore, the Attorney General ruled that Williamson County was required to withhold the customer identifying information but was required to release the other information in the waste tickets.

Waste Management then filed suit challenging the Attorney General's decision. In its petition, Waste Management sought a declaration that the information in the waste tickets was excepted from disclosure under Section 552.110(a) and (b) of the TPIA. Waste Management also sought injunctive relief against Williamson County to prevent it from releasing the information. As stated above, the trial court entered a final judgment in which it denied relief to Waste Management. The trial court issued findings of fact and conclusions of law. The trial court made the following findings of fact:

> 1. The information at issue is sequentially-numbered tickets showing the individual loads of solid-waste disposal events at the Williamson County landfill for July 14, 2009, as represented in Plaintiff's Exhibit 1.
>
> 2. The information at issue is not a trade secret.
>
> 3. Release of the information at issue would not cause substantial competitive harm to Plaintiff.
>
> 4. The information at issue must be disclosed to the requestor consistent with Attorney General Letter Ruling OR2009-15816.

The trial court concluded that Williamson County was required to disclose the information at issue to Johnson in accordance with the Attorney General's letter ruling. Waste Management has filed this appeal from the trial court's judgment.

*Issues on Appeal*

In two issues, Waste Management asserts that the trial court erred by ordering the disclosure of the pricing and volume information that is contained in the waste tickets. Specifically, Waste Management contends in its first issue that the information is protected from disclosure under Section 552.110(a) because it constitutes a trade secret. In its second issue, Waste Management contends that the information is protected from disclosure under Section 552.110(b) because disclosure of the information would cause substantial competitive harm to it.

*Standard of Review*

In an appeal from a bench trial, a trial court's findings of fact have the same force and effect as a jury's verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The trial court's findings of fact are reviewable for legal and factual sufficiency. *Anderson*, 806 S.W.2d at 794. As the factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Aguiar v. Segal*, 167 S.W.3d 443, 449 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Once the facts are established, a determination of whether an exception under the TPIA applies to support withholding public information is a question of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000).

*The TPIA*

The underlying purpose of the TPIA is to provide transparency in governmental affairs. *See* GOV'T § 552.001(a); *CareFlite v. Rural Hill Emergency Servs., Inc.*, No. 11-10-00306-CV, 2012 WL 3640257, at *3 (Tex. App.—Eastland Aug. 23, 2012, no pet.). The TPIA guarantees access to public information, subject to certain exceptions. *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). Those exceptions embrace the understanding that the public's right to know information is tempered by the individual and other interests at stake in disclosing that information. *Id.* The TPIA defines "public information" as

"information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business: (1) by a governmental body; or (2) for a governmental body and the governmental body owns the information or has a right of access to it." GOV'T § 552.002(a). Some information is considered to be core public information in the TPIA. *Cox Tex. Newspapers*, 343 S.W.3d at 114. This core public information includes, among other things, "information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body." GOV'T § 552.022(a)(3).

Core public information is excepted from required disclosure under the TPIA if it is "made confidential under [the TPIA] or other law." *Id.* § 552.022(a); *Cox Tex. Newspapers*, 343 S.W.3d at 114 n.4. Trade secret protection is "other law" that may allow a party to withhold disclosure of public information. *Center for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 348 (Tex. App.—Austin 2001, no pet.). Section 552.110(a) of the TPIA expressly excepts from disclosure "[a] trade secret obtained from a person and privileged or confidential by statute or judicial decision." Section 552.110(b) excepts from disclosure "[c]ommercial or financial information for which it is demonstrated based on specific factual evidence that disclosure would cause substantial competitive harm to the person from whom the information was obtained."

*Trade Secret Protection from Disclosure*

Waste Management contends that the pricing and volume information in the waste tickets constituted a trade secret. At trial, Waste Management had the burden to establish that the information was a trade secret. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied); *Center for Econ. Justice*, 39 S.W.3d at 344–45. Waste Management challenges the legal sufficiency of the evidence to support the trial court's finding that the information was not a trade secret. We are bound by the trial court's finding unless the evidence conclusively establishes, as a matter of law, that the information was a trade secret. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

A trade secret is any formula, pattern, device, or compilation of information that is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding). To determine whether a trade secret exists, Texas courts weigh six nonexclusive factors: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to

guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 591–92 (Tex. 2009); *In re Bass*, 113 S.W.3d at 739 (citing RESTATEMENT OF TORTS § 757 cmt. B (1939) and RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's note cmt. d (1995)). The party claiming a trade secret is not required to satisfy all six factors because trade secrets do not fit neatly into each factor every time. *In re Bass*, 113 S.W.3d at 740. Other circumstances that are not included in the six factors may be relevant to the trade secret analysis. *Id.* Accordingly, in our analysis, we weigh the factors in the context of the surrounding circumstances to determine whether information qualifies as a trade secret. *Id.*

A company's confidential pricing and rate information may qualify as a trade secret. *In re Union Pac. R.R. Co.*, 294 S.W.3d at 591–92; *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858–59 (Tex. App.—Fort Worth 2003, no pet.).

*The Evidence at Trial*

Mike Thompson, a senior manager for Waste Management, and Ruth Muelker, senior legal counsel for Waste Management, testified at trial. Thompson testified about the operation of the landfill and its customers. He said that Waste Management has an internal hauling company that disposes of waste at the landfill. Thompson said that the landfill has cash customers, gate customers, and discounted customers. While cash customers pay at the time they dispose of waste at the landfill, gate customers have an open account with the landfill. Cash customers and gate customers both pay the posted gate rate, which is generally the highest disposal rate charged at the landfill. At the time of trial, the posted gate rate was $31.50 per ton.

Thompson testified that the landfill's discounted customers dispose of high volumes of waste at the landfill. Thompson said that these customers are third-party haulers that compete with Waste Management in the waste disposal business. Because the third-party haulers dispose of high volumes of waste at the landfill, they were able to obtain a discounted disposal rate from Waste Management. Thompson's job duties included negotiating contracts with third-party haulers for the disposal of waste at the landfill. Thompson said that it normally takes three months to a year to negotiate these contracts and that negotiations sometimes last for years and years. He said that Waste Management incurs considerable expenses negotiating contracts and

6

developing relationships with its customers and potential customers. Thompson said that the discounted disposal rates at issue in this case are terms in contracts between Waste Management and the third-party haulers. The length of these contracts generally range from one year to five years and, sometimes, last for longer terms.

Waste Management generates waste tickets when customers dispose of waste at the landfill. Thompson testified that he had reviewed the waste tickets that were responsive to Johnson's open records request. Those waste tickets were submitted to the trial court in camera. The waste tickets show, among other things, the customer's name, the number of the truck used in the disposal, and the quantity of waste, measured in tons, disposed of by the customer at the landfill. Some of the waste tickets include pricing information that is applicable to the particular third-party hauler. These tickets show the rate per ton charged to the customer and the disposal fee charged to the customer. Thus, these tickets contain information that shows the contractual discounted disposal rate that the particular customer obtained from Waste Management.

Thompson testified that the revenue generated at the landfill drives the financial side of Waste Management's business. He said that volume and pricing are the "life blood" of the landfill and ensure that the landfill is financially healthy. Thompson said that Waste Management earned about 50% of the revenue at the landfill from the high volume third-party haulers that had discounted disposal rates. Thompson testified that the loss of large customers would result in the loss of "large chunks of revenue" to Waste Management. He said that, if a competitor of Waste Management obtained knowledge of Waste Management's pricing and volume information, the competitor could determine the negotiated discount rates in Waste Management's contracts. The competitor could then "undercut" the discounted rate and potentially take customers away from Waste Management. Thompson testified that, therefore, it was really important for Waste Management to keep the terms of its customers' discounted disposal rates confidential and proprietary. Thompson said these customers maintain an industry standard that their contract terms with Waste Management remain confidential.

As stated above, the Attorney General ruled that the customer identity information contained in the waste tickets was excepted from disclosure under the TPIA. Thompson said that, normally, a company's name is stated on the side of its trucks. Thompson testified that, if customer names are withheld, but the pricing and volume information contained in the waste tickets is released, a person could take that pricing and volume information, sit outside the gate at

7

the landfill, watch trucks enter the gate, and then tie those trucks to the truck number and the pricing and volume information shown in the waste tickets. Thompson believed that "it wouldn't take a whole lot of effort to tie specific trucks with specific weights and specific times." Therefore, the person could determine the confidential discounted disposal rates that are applicable to specific customers of Waste Management.

Thompson testified that Waste Management takes steps to protect the pricing and volume information from disclosure. Thompson said that Waste Management does not publish the negotiated disposal rates in publications or elsewhere. He said that a member of the public could not obtain volume and pricing information relating to Waste Management's customers at the landfill. Thompson said that Waste Management maintains hard copies of customer contracts only in a few, centralized locations. He testified that Waste Management's employees receive training about the confidential and proprietary nature of the pricing and volume information. Thompson said that Waste Management's employees sign confidentiality agreements in which they agree not to disclose the confidential information and acknowledge that they will be subject to prosecution if they disclose the information. He said that Waste Management's employees must obtain authorization from Waste Management's corporate office or upper management to see a customer's negotiated discount rate. Thompson also said that employee access to pricing information is "very limited" and that probably less than 20% of Waste Management's employees could obtain authorization to access it.

Muelker testified that she was involved in the LOA negotiations. The trial court admitted the LOA between Williamson County and Waste Management into evidence. Section 2.10(b)(1) of the LOA allows Waste Management to designate documents as confidential business records. The LOA defines "Confidential Business Records" as "all trade secrets, proprietary plans, financial data and the ideas and information contained therein, that Contractor makes available to County for purposes of this Agreement." Section 2.10(b)(1) provides as follows:

> Contractor may designate documents as Confidential Business Records. Documents reasonably so designated shall remain the exclusive property of Contractor.

Section 2.10(b)(3) provides in part as follows:

> County will not disclose information designated by Contractor as Confidential Business Records unless County, on advice of legal counsel, reasonably determines that the information concerned or any portion thereof is

subject to disclosure under Applicable Law. Contractor recognizes and agrees that even if County determines that certain information is properly withheld from public disclosure, a court or the Texas Attorney General may order the disclosure of such information whereupon County shall have no liability to Contractor for any loss or damages resulting from such disclosure.

Section 2.11 of the LOA requires Waste Management to generate reports and records relating to its operation of the landfill. Section 2.11(a)(1) requires Waste Management to provide Williamson County with monthly reports that show, among other things, the total tonnage received at the landfill for disposal, recycling, and diversion and the total revenue received by Waste Management. Section 2.11(b) sets forth Waste Management's recordkeeping obligations. It provides as follows:

(1) Contractor shall record all weights and charges made to users of the Landfill on sequentially numbered tickets. . . . Contractor shall retain all records, data, and/or tickets that represent or document each and every transaction at the Landfill for a period of seven years from the date the transaction occurred. County and/or its designees shall have unrestricted access to such material, which shall be produced for inspection at reasonable hours upon request by County.

(2) . . . . County shall have access at reasonable hours to all of Contractor's on-site records, and all the papers and documents relating to Contractor's Landfill operations within Williamson County. County, at its sole discretion and expense, may employ internal or outside consultants to audit or verify the financial records and reports of the Contractor, and to ensure compliance with the Permit and Applicable Laws. Contractor shall cooperate with County, its officers, employees, agents, or consultants, by making its employees and records available for the purpose of this section.

(i) Contractor shall keep accurate records of all transactions related to or connected with this Agreement including, but not limited to, all correspondence and invoices, [and] copies of weigh tickets or receipts issued at the Landfill. . . . Except as otherwise provided in this Agreement, each of the records kept under this section shall remain the exclusive property of County; however, should this Agreement be terminated, Contractor has the right to retain one (1) copy of all Landfill records for insurance and archival purposes.

Muelker testified about Sections 2.10 and 2.11 of the LOA. She said that, during negotiations of the contract, Waste Management took the position that documents such as waste tickets included confidential information. Muelker said that she had discussions with

representatives of Williamson County relating to confidential information maintained by Waste Management, such as customer pricing and volume information. As stated above, Section 2.11(b)(2)(i) of the LOA provides that "[e]xcept as otherwise provided in this Agreement, each of the records kept under this section shall remain the exclusive property of County." Muelker testified that the language "[e]xcept as otherwise provided in this Agreement" was included in Section 2.11(b)(2)(i) because the parties understood that Williamson County would have access to documents that contained confidential information. Muelker said that "[e]xcept as otherwise provided in this Agreement" referred to Section 2.10(b)(1), which allowed Waste Management to designate documents as confidential business information.

Muelker testified that Waste Management has always designated negotiated price and customer volume information as confidential information in its policies and procedures. Muelker said that Waste Management maintained the waste tickets and that Williamson County had not asked for copies of any waste tickets until Johnson's open records request. Muelker said that, when Williamson County notified Waste Management about Johnson's request, she immediately informed a Williamson County representative that Waste Management considered the information contained in the waste tickets to be confidential.

Muelker did not believe that Williamson County knew the discounted pricing rates that applied to Waste Management's customers. Under Section 3.3(a) of the LOA, Waste Management must pay Williamson County a monthly surcharge of 14.5% of the gross receipts, as defined in the LOA, that are generated by solid waste disposal at the landfill. Section 3.3(b) of the LOA requires Waste Management to pay Williamson County a monthly surcharge of 6.5% of the gross receipts, as defined in the LOA, for recyclables and diverted material accepted at the landfill. Section 3.3(c) of the LOA provides that "the portion of the Gross Receipts based on Tipping Fees shall be calculated by multiplying the published gate rate by the number of tons brought into the Landfill for disposal or recycling by the surcharge rates set in Sections 3.3(a) and (b)." The terms "Tip Fee" and "Tipping Fee" are defined in the LOA as "the posted gate rate of rates charged to customers at the Landfill, and does not include any discounted rate." Section 3.3(c) also provides that "[i]t is the intent of this provision to exclude any discount which Contractor may provide its customers from the surcharge calculation." Under Section 3.5(a), Waste Management must pay Williamson County a yearly fee based on 1% of the "Tip Fee" for

solid waste disposed of at the landfill. Similar to the payment of the surcharges, the payment of the yearly fee is based on the gate rate, not on discounted rates that apply to particular customers.

Muelker testified that, because the payment of surcharges and fees to Williamson County is based on the actual tonnage disposed of and the gate rate, Williamson County did not need to know the discounted rates that apply to particular customers to determine whether Waste Management paid it the correct amounts. Instead, Williamson County needed to know the total tonnage of waste disposed of at the landfill and the gate rate to determine whether it was receiving the correct amounts. Thompson testified that Waste Management provided monthly reports to Williamson County that showed the total tonnage disposed of at the landfill and the revenue received at the landfill.

*Analysis*

Waste Management contends that the uncontroverted evidence established that the pricing and volume information in the waste tickets met the definition of a trade secret. The Attorney General contends that the pricing and volume information is not a trade secret because, under the LOA, Williamson County retained a contractual right to access the information for audit purposes and owned the waste tickets. The Attorney General states in his brief that "the County's interest in the information is inconsistent with Waste Management's claim of sole proprietary ownership over the disposal volume and rate information." The Attorney General also contends that Waste Management failed to meet its evidentiary burden to establish that the pricing and volume information, standing alone, was a trade secret. To support this contention, the Attorney General states in his brief that "Waste Management's own witness repeatedly stated and agreed that the information was only sensitive or release harmful when such release was combined with the name of Waste Management's customers." Johnson contends in his brief that the pricing and volume information contained in the waste tickets does not constitute a trade secret.

Waste Management presented evidence relevant to the six nonexclusive trade secret factors. The first factor considers the extent to which the information is known outside the business. Thompson testified that it was important for Waste Management to keep its pricing and volume information confidential. Muelker testified that Waste Management considers the information to be confidential. Thompson said that Waste Management does not publish its

11

pricing and volume information. He did not believe that a member of the public could obtain the information.

Each discounted customer knows the negotiated rate that applies to it. Waste Management did not waive trade secret protection by sharing pricing and volume information with the very customers to which the pricing and volume information applied. *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200–01 (5th Cir. 1986) (limited disclosures of trade secret information to companies with which the disclosing company had a business relationship and for the purpose of furthering its economic interests did not destroy trade secret protection for the information). Waste Management had not disclosed pricing and volume information that applied to a particular discounted customer to any other customer or third party. Thompson testified that an industry custom exists that customers do not share their pricing and volume information with other customers.

Under the LOA, Waste Management is required to share its volume and pricing information with Williamson County if the county so requests. Providing trade secret information to a governmental body as required by it does not waive a company's trade secret protection. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991) (company did not lose trade secret protection for information in architectural plans that it was required to file with a municipality to obtain a building permit). Thus, the provision of the LOA that requires Waste Management to share the information with Williamson County at the county's request did not result in a loss of Waste Management's trade secret protection for its volume and pricing information. Muelker testified that, although Williamson County was entitled to review the pricing and volume information pursuant to the LOA, Williamson County had not asked for copies of any waste tickets until Johnson made his open records request. As such, Waste Management had not disclosed the discounted pricing and volume information to Williamson County. Muelker said that, during negotiations of the LOA, she and representatives of Williamson County had discussions about the confidential nature of some information maintained by Waste Management, such as its customer pricing and volume information. The Confidential Business Records provisions were included in the LOA so that Waste Management could protect its confidential information from disclosure. The LOA provides that documents reasonably designated by Waste Management as confidential business records shall remain its exclusive property. As soon as Muelker learned of Johnson's open records request, Muelker

informed Williamson County that Waste Management considered the pricing and volume information in the waste tickets to be confidential.

The second factor considers the extent the information is known by employees and others involved in the business. Out of necessity, Waste Management shares its discounted pricing and volume information with a limited number of its employees in connection with the employees' performance of their job duties. Thompson said that probably less than 20% of Waste Management's employees could obtain authorization to see the pricing and volume information.

The third factor considers the extent of measures taken to guard the secrecy of the information. Thompson testified that Waste Management's employees receive training that the pricing and volume information is confidential and that the employees sign confidentiality agreements relating to the information. Muelker testified that the confidentiality provisions in the LOA were included so that Waste Management could protect its confidential information from disclosure. The evidence shows that Waste Management has vigilantly guarded the secrecy of its pricing and volume information.

The fourth factor considers the value of the information to the business and its competitors. Thompson explained the relationship between pricing and volume and the importance of the pricing and volume information to Waste Management and its competitors. The customers that obtained discount pricing rates were high volume customers. They accounted for about 50% of the revenue generated by Waste Management at the landfill. The loss of any one of these customers would have a significant and negative impact on the revenue generated at the landfill. Thompson stressed the need for Waste Management to keep information that related to its discounted customers confidential and proprietary. Thompson testified that, if a competitor learned the pricing and volume information related to Waste Management's discounted customers, the competitor could offer the customers a lower rate and, therefore, possibly take customers away from Waste Management. According to Thompson, this knowledge would give the competitor a competitive advantage over Waste Management.

The fifth factor considers the amount of effort or money expended in developing the information. Thompson's testimony shows that Waste Management devotes substantial efforts and money toward negotiating and developing the discounted rates and also toward developing and maintaining its relationships with its customers. Thompson testified that negotiating rates

13

with customers and potential customers is a lengthy process. He said that, sometimes, the negotiations last for years and years.

The sixth factor considers the ease or difficulty with which the information could be properly acquired or duplicated by others. Thompson testified that, if the pricing and volume information contained on the waste tickets is not released, it would be very difficult for a third party to figure out the pricing and volume information. He said that a party could not determine the volume and pricing information by sitting outside the landfill and observing trucks entering and leaving it.

Considering the evidence, the trade secret factors weigh strongly in Waste Management's favor. Based on our review of the record, we conclude that the evidence conclusively establishes that the pricing and volume information in the waste tickets is a trade secret.

This case is factually distinguishable from *Boeing Co. v. Abbott*, No. 03-10-00411-CV, 2012 WL 753170 (Tex. App.—Austin Mar. 9, 2012, pet. filed), which is cited by the Attorney General. In that case, Boeing asserted that certain terms of a lease agreement between it and The Greater Kelly Development Authority n/k/a The Port Authority of San Antonio constituted trade secrets. 2012 WL 753170, at *2. In *Boeing*, the trial court found that the lease information was not a trade secret. *Id.* The Austin Court of Appeals concluded that Boeing had failed to establish that the lease information constituted a trade secret as a matter of law and that, therefore, the trial court had not erred in finding that the information was not a trade secret. *Id.* at *7. Unlike the LOA in this case, the lease agreement in *Boeing* did not contain confidentiality provisions. *Id.* at *6. Additionally, the Austin Court of Appeals noted that there was no evidence that Boeing informed the Port that it considered the lease information to be confidential or a trade secret at the time it entered into the lease or that Boeing took any reasonable precautions to prevent the Port from disclosing the information. *Id.* Thus, the facts in *Boeing* are markedly different from those in the instant case.

The Attorney General asserts in his brief that Waste Management conceded in its motion for new trial that the pricing and volume information, standing alone without a disclosure of customer names, was not a trade secret. However, a review of the record shows that Waste Management made no such concession. Waste Management consistently asserted in the trial court that the pricing and volume information constituted a trade secret. As we have concluded above, Waste Management established that the pricing and volume information is a trade secret.

Once Waste Management met this burden, the information was excepted from disclosure under Section 552.110 of the TPIA.

The trial court erred when it ordered the disclosure of the pricing and volume information in the waste tickets. Waste Management's first issue is sustained. Based on our ruling on Waste Management's first issue, we need not address its second issue. TEX. R. APP. P. 47.1.

*This Court's Ruling*

We reverse the judgment of the trial court, and we render judgment that the customer names and the pricing and volume information in the subject waste tickets are excepted from disclosure under the TPIA and that, therefore, Williamson County is prohibited from disclosing the information to the requestor.

TERRY McCALL
JUSTICE

April 11, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Hill.[1]

---

[1]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.