Opinion issued August 27, 2019



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-17-00882-CV

————————————

## MICHAEL FALLON, M.D., Appellant

## V.

## MD ANDERSON PHYSICIANS NETWORK AND MICHAEL W. BROWN, AS PRESIDENT AND CHIEF EXECUTIVE OFFICER OF MD ANDERSON PHYSICIANS NETWORK, Appellees

On Appeal from the 151st District Court
Harris County, Texas
Trial Court Case No. 2017-36113

## O P I N I O N

Appellant, Michael Fallon, M.D., challenges the trial court's rendition of

summary judgment in favor of appellees, MD Anderson Physicians Network and

Michael W. Brown, as President and Chief Executive Officer of MD Anderson

Physicians Network (collectively, "Physicians Network"), in Fallon's suit for a writ of mandamus and a declaratory judgment.[1] In five issues, Fallon contends that the trial court erred in granting the Physicians Network summary judgment and denying him summary judgment.

We affirm.

**Background**

In his first amended petition, Fallon alleges that he is an individual residing in New York and the Physicians Network is a "governmental body" of the State of Texas. Fallon also alleges that the Physicians Network is a subsidiary of The University of Texas MD Anderson Cancer Center (the "Cancer Center") and the Physicians Network maintains communications with the Cancer Center.

Previously, Fallon, pursuant to the Texas Public Information Act ("PIA"),[2] served the Cancer Center with a public information request, seeking nine categories of information, including certain "electronic communications." It is undisputed that the Cancer Center is a "governmental body" under the PIA.[3] Although the Cancer Center produced some information responsive to Fallon's request, it also informed

---

[1] *See* TEX. GOV'T CODE ANN. § 552.321 ("Suit for Writ of Mandamus"); TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011 ("Uniform Declaratory Judgments Act" (the "DJA")).

[2] *See* TEX. GOV'T CODE ANN. §§ 552.001–.353.

[3] *See id.* § 552.003(1).

him that "certain electronic communications from September 2013 to [the] present . . . were maintained by a . . . non-governmental body," i.e., the Physicians Network.

On July 11, 2016, Fallon, pursuant to the PIA, served the Physicians Network with a public information request, seeking eleven categories of information:

1) All documents, including but not limited to emails, faxes, letters, text messages, instant messenger messages, other electronic records, handwritten notes, typewritten notes, and other records that are regarding, or that name or allude to, in any way, Dr. Michael Fallon.

2) All documents . . . that are regarding, in any way, the MD Anderson Certified Member program involving Our Lady of Lourdes Memorial Hospital of Binghamton, New York, or its affiliates.

3) All documents, . . . from September 1, 2013, to the present, that name, concern, or allude to, in any way, any of the [twelve listed] individuals[.]

4) The MD Anderson PN "Radiation Oncology Provider Quality Assessment – *Provisional*" reports for the Radiation Oncologists certified by MD Anderson at the [fourteen listed] institutions with patient, physician, and institution identifiers redacted. The information requested pertains to the [forty-three] radiation oncologists listed on the MD Anderson website.

5) All documents . . . that show the dollar amount of gross revenue received by MD Anderson Physicians Network from the [fourteen listed] institutions . . . .

6) All documents . . . that show the minutes, transcripts, notes, or recordings of the University of Texas MD Anderson Cancer Center and MD Anderson Physicians Network Board meetings

3

from September 1, 2013 to January 31, 2016, with all patient identifiers redacted.

7)   All documents . . . that show any agreements or engagements that name or allude to, in any way, the [seven listed] consultants[.]

8)   All documents . . . that show the dollar amount of fees paid by MD Anderson Physicians Network to the [seven listed] consultants . . . .

9)   All documents . . . that show the affiliation and discovery or due diligence agreement between MD Anderson Physicians Network and Our Lady of Lourdes Memorial Hospital of Binghamton, NY, or its affiliates.

10)  All documents . . . that show the name of the officer for public information of MD Anderson Physicians Network between January 1, 2015 and today.  If only one person served as the officer for public information of MD Anderson PN during that period, one document showing the name of that person would suffice.

11)  All documents . . . that are regarding, or that name or allude to, in any way, [a listed individual].

After the Physicians Network sought clarification of Fallon's public information request, Fallon "clarified his request[] as to time and specified parties."   And the Physicians Network sought an opinion from the Attorney General as to whether it constituted a "governmental body" under the PIA, whether it was subject to the PIA's disclosure requirements, and whether certain exceptions to disclosure applied.[4]  The Attorney General issued an open records letter ruling, concluding that

---

[4]   *See id.* §§ 552.301–.309 ("Attorney General Decisions").

the Physicians Network is not a "governmental body" and not subject to the PIA or its disclosure requirements.[5] (Internal quotations omitted.)

According to Fallon, despite the Attorney General's conclusion, the Physicians Network is a "governmental body" and subject to the PIA. Further, the information responsive to Fallon's request is in the possession of the Physicians Network and constitutes "public information." Thus, Fallon seeks a writ of mandamus to compel the Physicians Network to produce the information responsive to his request.[6] Fallon also seeks declarations that the Physicians Network is a "governmental body" subject to the PIA, the Physicians Network is the functional equivalent of a "governmental body" subject to the PIA, the Physicians Network is agent of a "governmental body" subject to the PIA, and the Physicians Network must disclose the information requested by Fallon.[7]

The Physicians Network answered, generally denying Fallon's allegations and asserting certain affirmative defenses.

Fallon then filed a combined no-evidence and matter-of-law summary-judgment motion, arguing that the Physicians Network is a "governmental body" under the PIA because it was "created by the executive or legislative branch

---

[5]    *See* Tex. Att'y Gen. OR2016-22964.

[6]    *See* TEX. GOV'T CODE ANN. § 552.321 ("Suit for Writ of Mandamus").

[7]    TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011.

of state government" and is "directed by one or more elected or appointed members";[8] the Physicians Network is the functional equivalent of a "governmental body" because it is supported by public funds;[9] the Physicians Network "must make all public information in its possession available to . . . Fallon[] regardless of its status as a governmental body" because Fallon seeks "public information" owned by and accessible to the Cancer Center; and the Physicians Network presents no evidence of any applicable exceptions to disclosure under the PIA.[10]  (Internal quotations omitted.)  Fallon attached exhibits to his motion.

The Physicians Network filed a response and a cross-motion for a matter-of-law summary judgment, asserting that it did not constitute a "governmental body" under the PIA as a matter of law because it is not "created by . . . the executive or legislative branch [of state government]," is not "directed by elected or appointed members," and is not "supported, in whole or in part, by public funds";[11] Fallon's "functional equivalent argument[]" is misplaced and not "the correct legal test" for determining whether an entity is subject to the PIA; and Fallon's no-evidence summary-judgment motion was premature and there is more than a scintilla of evidence that the exceptions asserted by the Physicians Network

---

[8]     *See* TEX. GOV'T CODE ANN. § 552.003(1)(A)(i).

[9]     *See id.* § 552.003(1)(A)(xii).

[10]    *See id.* §§ 552.101–.158 ("Information Excepted from Required Disclosure").

[11]    *See id.* § 552.003(1)(A)(i), (xii).

6

apply.[12]  The Physicians Network attached exhibits to its response and cross-motion. And in connection with its cross-motion for summary judgment, the Physicians Network moved to file four summary-judgment exhibits in camera with the trial court pursuant to the PIA.[13]

In reply to the Physicians Network's response, Fallon asserted that the Physicians Network constitutes a "governmental body" "because it [is] unable to perform its services without governmental funding and acts as the functional equivalent" of a "governmental body"; the Physician's Network must disclose the requested "public information" regardless of its status as a "governmental body"; and there is no evidence to support the Physician Network's "claimed exceptions" to disclosure.

In response to the Physicians Network's cross-motion for summary judgment, Fallon argued that the Physicians Network constitutes a "governmental body" because it was "created by the [e]xecutive branch[] with [t]rustees appointed by the [e]xecutive [b]ranch."[14]  Fallon further argued that the Physicians Network was the "functional equivalent" of a "governmental body" because it is supported by public funds, it is fully controlled by the government for the government's purposes, and

---

[12]  *See id.* §§ 552.101–.159.

[13]  *See id.* § 552.3221 ("In Camera Inspection of Information").

[14]  *See id.* § 552.003(1)(A)(i).

7

the Cancer Center, a governmental entity, is not merely a client of the Physicians Network.[15] Moreover, Fallon asserted that, regardless of the Physicians Network's status as a "governmental body" it was required to provide Fallon with the requested information because the information is "public information" and owned by the Cancer Center. Fallon attached to his response the same exhibits that he had previously attached to his own summary-judgment motion. Fallon also opposed the Physicians Network's motion to file its four summary-judgment exhibits in camera.[16]

The trial court granted the Physicians Network's motion to file its four summary-judgment exhibits in camera pursuant to the PIA.[17] The trial court then granted Physicians Network's cross-motion for summary judgment and denied Fallon's summary-judgment motion, ruling that the Physicians Network is not a "governmental body" under the PIA.

## Standard of Review

We review a trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Although the denial of a summary-judgment motion is normally not appealable, we

---

[15] *See id.* § 552.003(1)(A)(xii).

[16] *See id.* § 552.3221.

[17] Fallon did not appeal the trial court's order granting the Physician Network's motion to file its four summary-judgment exhibits in camera pursuant to the PIA. *See id.*

may review such a denial when both parties have moved for summary judgment and the trial court grants one motion and denies the other. *Id.* In our review of such cross-motions, we review the summary-judgment evidence presented by each party, determine all issues presented, and render the judgment that the trial court should have rendered. *Id.* If we determine that a fact issue precludes summary judgment for either party, we remand the cause for trial. *See Univ. of Tex. Health Sci. Ctr. at Hous. v. Big Train Carpet of El Campo, Inc.*, 739 S.W.2d 792, 792 (Tex. 1987).

To prevail on a matter-of-law summary-judgment motion, a movant has the burden of establishing that he is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a plaintiff moves for summary judgment on his own claim, he must conclusively prove all essential elements of his cause of action. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr.*

9

*Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in the non-movant's favor. *Id.* at 549.

**Summary Judgment**

In five issues, Fallon argues that the trial court erred in granting the Physicians Network summary judgment and denying him summary judgment because the Physicians Network constitutes a "governmental body" under the PIA; the Physicians Network acts as the functional equivalent of a "governmental body" and is subject to the PIA; the Physicians Network is required to provide Fallon with the requested information regardless of whether it is a "governmental body"; and none of the exceptions to disclosure under the PIA apply to the instant case.

**A.    Governmental Body**

The purpose of the PIA is to provide the public with "complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE ANN. § 552.001(a); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011) (internal quotations omitted); *see also Paxton v. City of Dall.*, 509 S.W.3d 247, 251 (Tex. 2017) (fundamental precept of PIA is that "[t]he people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know" (alteration in original) (internal quotations omitted)). Under the PIA, a

"governmental body" must promptly produce "public information" on request unless an exception to disclosure applies and is timely asserted. *See* TEX. GOV'T CODE ANN. §§ 552.101–.159, 552.221; *see also Paxton*, 509 S.W.3d at 251; *CareFlite v. Rural Hill Emergency Med. Servs., Inc.*, 418 S.W.3d 132, 136 (Tex. App.—Eastland 2012, no pet.). Thus, as the Texas Supreme Court has noted, the consequences of an entity being characterized as a "governmental body" are considerable. *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 57 (Tex. 2015) ("[A]n entity's disclosure obligations under the []PIA hinge on whether it is in fact a governmental body." (internal quotations omitted)); *see also Cooper v. Circle Ten Council Boy Scouts of Am.*, 254 S.W.3d 689, 694 (Tex. App.—Dallas 2008, no pet.) ("If a person requests public information from a governmental body and the governmental body fails to disclose the information, the requestor may enforce the statutory right of access by suing for a writ of mandamus to compel disclosure.").

The PIA provides several definitions of a "[g]overnmental body." *See* TEX. GOV'T CODE ANN. § 552.003(1) (internal quotations omitted); *see also Greater Hous.*, 468 S.W.3d at 57 (PIA defines "governmental body as one of twelve different types of entities" (internal quotations omitted)); *CareFlite*, 418 S.W.3d at 136. Determining whether an entity is a "governmental body" that is subject to the disclosure requirements of the PIA is a matter of statutory construction that we

11

review de novo. *See Greater Hous.*, 468 S.W.3d at 58 (internal quotations omitted); *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 357 (Tex. 2000).

Relevant to the instant case, the PIA defines a "[g]overnmental body" as follows:

> (i)  a board, commission, department, committee, institution, agency, or office that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members; [and]
>
> . . .
>
> (xii)  the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds[.]

TEX. GOV'T CODE ANN. § 552.003(1)(A)(i), (xii).

When interpreting a statute, our primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding the statute's scope. *Greater Hous.*, 468 S.W.3d at 58; *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013). We seek that intent first and foremost in the plain meaning of the text. *Greater Hous.*, 468 S.W.3d at 58; *City of Lorena*, 409 S.W.3d at 641; *see also Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *see also Greater*

12

*Hous.*, 468 S.W.3d at 58. "However, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013); *see also Greater Hous.*, 468 S.W.3d at 58. Therefore, even if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole. *Greater Hous.*, 468 S.W.3d at 58. We only resort to rules of construction or extrinsic aids when a statute's words are ambiguous. *Id.*; *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Finally, in construing the PIA, we are mindful of the legislative mandate that the PIA "shall be liberally construed in favor of granting a request for information." TEX. GOV'T CODE ANN. § 552.001(b); *see also id.* § 552.001(a); *Greater Hous.*, 468 S.W.3d at 58.

> **1. Created by the executive or legislative branch of state government and directed by one or more elected or appointed members.**

In his first issue, Fallon argues that the Physicians Network constitutes a "governmental body" under the PIA because, under Texas Government Code section 552.003(1)(A)(i), the Cancer Center created the Physicians Network, the Cancer Center is "a division of the University of Texas System, an institution within the executive branch of the state government," and the Physicians Network was indirectly created by the executive branch of the state government. Further, according to Fallon, the Cancer Center "appoints each and every member of [the

Physician Network's] [b]oard of [d]irectors" and the Cancer Center "exerts actual control over [the Physicians Network's] operation."[18]  *See* TEX. GOV'T CODE ANN. § 552.003(1)(A)(i).  In response, the Physicians Network asserts, inter alia, that it does not constitute a "governmental body" because it is a non-profit corporation and section 552.003(1)(A)(i) does not apply to a corporation.

The plain language of section 552.003(1)(A)(i) states that a "[g]overnmental body" means "*a board, commission, department, committee, institution, agency, or office* that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members." *Id.* § 552.003(1)(A)(i) (emphasis added).  Notably absent from this definition is the word "corporation." *See Tex. Lottery Comm'n*, 325 S.W.3d at 635 ("We rely on the plain meaning of the text as expressing legislative intent . . . .").  We presume that the Legislature chooses a statute's language with care, including each word chosen

---

[18]  We note that the Attorney General in his open records letter ruling rejected Fallon's assertion that the Physicians Network is a "governmental body" under Texas Government Code section 552.003(1)(A)(i).  *See* Tex. Att'y Gen. OR2016-22964 (finding only "governmental body" definition relevant to instant case to be definition concerning "public funds" under section 552.003(1)(A)(xii) (internal quotations omitted)); *see also* TEX. GOV'T CODE ANN. § 552.306 ("Rendition of Attorney General Decision; Issuance of Written Opinion"); *Tex. Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 591 (Tex. App.—Austin 2012, no pet.) ("[I]n construing the PIA, we give due consideration to the Attorney General's PIA decisions, even though they are not binding . . . ."); *Hous. Indep. Sch. Dist. v. Hous. Chronicle Publ'g Co.*, 798 S.W.2d 580, 588 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (Attorney General PIA decisions should be given great weight by courts, although they are not binding on them).

14

for a purpose, while purposefully omitting words not chosen. *See Combs*, 340 S.W.3d at 439; *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 211 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result. *Entergy Gulf States*, 282 S.W.3d at 437; *Choice! Power*, 501 S.W.3d at 211. As the Texas Supreme Court has explained, most of the entities listed as "governmental bod[ies]" in section 522.003(1) are identified quite precisely by the Legislature in the statute. *Greater Hous.*, 468 S.W.3d at 57.

Fallon concedes that section 552.003(1)(A)(i) does not specifically include the term "corporation," but instead argues that the section is applicable to the Physicians Network because it includes the term "institution." (Internal quotations omitted.) And, according to Fallon, the dictionary definition of the term "institution" is broad enough to include a non-profit corporation such as the Physicians Network.[19] (Internal quotations omitted).

The words of a statute cannot be examined in isolation but must be construed based on the context in which they are used. *Combs*, 340 S.W.3d at 441; *Choice! Power*, 501 S.W.3d at 211. Black's Law Dictionary defines institution as: "An established organization, esp. one of a public character, such as a facility for the treatment of mentally disabled persons." *Institution*, BLACK'S LAW DICTIONARY

---

[19] The parties do not dispute that the Physicians Network is a corporation.

(11th ed. 2019). Despite Fallon's assertion that the term "institution" could take the "legal form of a corporation," we note that the clear language of the statute shows that the Legislature did not intend for the term "institution" to include a corporation. (Internal quotations omitted.) *See Greater Hous.*, 468 S.W.3d at 61 ("The canon of statutory construction known as *noscitur a sociis*—'it is known by its associates'—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it. We rely on this principle to avoid ascribing to one word a meaning so broad that it is incommensurate with the statutory context." (internal citation omitted)).

For instance, in section 552.003(1)(A)(xii), the Legislature specifically identified both "corporation[s]" and "institution[s]" as entities that constitute "[g]overnmental bod[ies]" if they "spend or [are] supported in whole or in part by public funds." *See* TEX. GOV'T CODE ANN. § 552.003(1)(A)(xii) ("[g]overnmental body" means "the part, section, or portion of an organization, *corporation*, commission, committee, *institution*, or agency that spends or that is supported in whole or in part by public funds" (emphasis added)); *see also id.* §§ 552.003(1)(A)(ix) (identifying as "[g]overnmental body" "a nonprofit *corporation* organized under Chapter 67, Water Code, that provides a water supply or wastewater service, or both, and is exempt from ad valorem taxation" (emphasis added)), 552.003(1)(A)(xi) (identifying as "[g]overnmental body" "a nonprofit

16

*corporation* that is eligible to receive funds under the federal community services block grant program and that is authorized by this state to serve a geographic area of the state" (emphasis added)).  To conclude that the term "institution" identified in section 552.003(1)(A)(i) includes the term "corporation" would render the use of the term "corporation" in section 552.003(1)(A)(xii) as mere surplusage.  *See Kallinen v. City of Hous.*, 462 S.W.3d 25, 28 (Tex. 2015).  As the Texas Supreme Court has recognized, a term's meaning must be in harmony and consistent with other statutory terms and if a more limited or precise definition is apparent from the term's use in the context of the statute, we will apply that meaning.  *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016); *$1,760.00*, 406 S.W.3d at 180 ("[W]e will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute.").

Based on the foregoing, we hold that the Physicians Network, a non-profit corporation, does not constitute a "governmental body" under Texas Government Code section 552.003(1)(A)(i), which defines a "[g]overnmental body" as "a board, commission, department, committee, institution, agency, or office that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members."  TEX. GOV'T CODE ANN. § 552.003(1)(A)(i).  And the trial court did not err in granting the Physicians Network summary judgment and denying Fallon summary judgment on such a basis.

17

We overrule Fallon's first issue.

## 2. Supported in whole or in part by public funds.

In his second issue, Fallon argues that the Physicians Network constitutes a "governmental body" under the PIA because, under Texas Government Code section 552.003(1)(A)(xii), the Physicians Network is supported by public funds and it "operates as the functional equivalent of" a "governmental body." *See id.* § 552.003(1)(A)(xii). In response, the Physicians Network asserts that it is not a "governmental body" under section 552.003(1)(A)(xii) because it is not sustained by public funding; it could continue to perform the same or similar services without any of the funds that it receives from the Cancer Center for the services it provides to the Cancer Center; the vast majority of its revenue comes from its contractual relationships with entities that are not the Cancer Center and that are not governmental bodies; the services that the Physicians Network provides to and receives from the Cancer Center are pursuant to a series of quid pro quo contracts; and the functional-equivalency test advanced by Fallon is not the "test" for determining whether an entity constitutes a "governmental body" and thus subject to the PIA's disclosure requirements.

Section 552.003(1)(A)(xii) states that a "[g]overnmental body" means "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that *is supported in whole or in part by public*

18

*funds.*" *Id.* (emphasis added). "Public funds" means "funds of the state or of a governmental subdivision of the state." *Id.* § 552.003(5) (internal quotations omitted). The Texas Supreme Court has held that the phrase "supported in whole or in part by public funds" includes only those private entities, or their sub-parts, that are sustained, at least in part, by public funds, "meaning [that] they could not perform the same or similar services without the public funds." *Greater Hous.*, 468 S.W.3d at 63 (internal quotations omitted). In other words, section 552.003(1)(A)(xii) "encompasses only those private entities [that are] dependent on the public fisc to operate as a going concern." *Id.* at 61.

In *Greater Houston*, the Texas Supreme Court addressed the question of whether a private entity constituted a "governmental body" and was thus subjected to the public disclosure requirements under the PIA. *Id.* at 53 (internal quotations omitted). There, Greater Houston Partnership ("GHP"), a non-profit corporation, provided economic-development services to the City of Houston (the "City") and other clients pursuant to quid pro quo contracts. *Id.* at 54. GHP's stated purpose is to enhance economic prosperity, facilitate business relocation and expansion, encourage international outreach initiatives, and provide strategic planning to advocate for "the improvement of commercial, industrial, agricultural, civic, and cultural affairs" in the Houston region. *Id.* (internal quotations omitted). Consistent with its purpose, GHP provides consulting, event planning, and marketing services

19

to approximately 2,100 member companies on a contractual basis. *Id.* GHP provided such services to the City for several years. *Id.*

Pursuant to the PIA, a City-resident requested from GHP copies of its 2007 and 2008 check registers, asserting that GHP constituted a "governmental body" under the PIA because it is an entity "that spends or that is supported in whole or in part by public funds." *Id.* at 54–55 (internal quotations omitted); *see also* TEX. GOV'T CODE ANN. § 552.003(1)(A)(xii). GHP objected to the resident's request, asserting that, although it receives public funds from the City, it does not qualify as a "governmental body" under the PIA because (1) the public funds were for compensation for services provided pursuant to a quid pro quo contract with the City, (2) the City's annual payments under the contract amounted to less than eight percent of GHP's annual revenue, while revenue from GHP's other member companies totaled more than ninety percent of GHP's annual revenue, and (3) only four of GHP's 2,100 member companies could be described as "governmental bodies." *Greater Hous.*, 468 S.W.3d at 55 (internal quotations omitted). In an open records letter ruling, the Attorney General conclude that GHP was a "governmental body" subject to the PIA's disclosure requirements. *Id.* at 55 (internal quotations omitted). Similarly, the trial court found that GHP constituted a "governmental body" supported by public funds and ordered the disclosure of GHP's 2007 and 2008 check registers. *Id.* at 55–56 (internal quotations omitted). After the court of appeals

affirmed the trial court's ruling, GHP sought review by the Texas Supreme Court. *Id.* at 56–57.

On appeal, the Texas Supreme Court sought to determine whether GHP constituted a "governmental body" under the PIA because a "part, section, or portion" of it "is supported in whole or in part by public funds." *Id.* at 56–63, 66–67 (internal quotations omitted); *see also* TEX. GOV'T CODE ANN. § 552.003(1)(A)(xii). According to GHP, the Legislature only intended for private entities that were created or that exist to carry out governmental functions, and whose existences are maintained in whole or in part with public funds, to be subject to the disclosure requirements of the PIA. *Greater Hous.*, 468 S.W.3d at 58. The Supreme Court agreed, concluding that the PIA only applies to private entities acting as the functional equivalent of the government and that are "sustained" by public funds. *Id.* at 53–54, 58–63 (internal quotations omitted). As the Court explained:

> To be "sustained" by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent. Financial dependency need not be absolute, however. Rather, the government could be one of several contributing sources. But sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations. Unquestionably, a private entity would qualify under a financially dependent construction of "supported" if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors. In short, an entity "supported" by public funds would not just receive government funds; it would require them to operate in whole or in part.

21

*Id.* at 60–61. And by concluding that "supported . . . by public funds" only includes those private entities that are "sustained" by public funds, this ensures that the PIA "encompasses only those private entities dependent on the public fisc to operate as a going concern," i.e. they could not perform the same or similar services without the public funds that they receive. *Id.* at 61, 63 (internal quotations omitted).

Turning to GHP, specifically, the Supreme Court noted that "[d]etermining whether a partially funded entity qualifies as a 'governmental body' . . . require[s] [a] case-specific analysis and a close examination of the facts." *Id.* at 63. In the case of GHP, the evidence showed that GHP receives only a small portion of its revenue from its contracts with a "governmental body" and it could continue to operate given the substantial revenue it derives from other non-governmental sources even if GHP's governmental contracts were eliminated. *Id.* at 55, 61, 66–67 ("The City's annual payments under [its] contract [with GHP] amounted to less than [eight percent] of GHP's total annual revenue; [other] member [companies'] contributions, on the other hand, totaled more than [ninety percent] of its revenue."). Simply put, because GHP "does not require public funds," it "is not sustained by public funds." *Id.* at 61. The Court further noted that GHP is not rendered a "governmental body" because it receives funds pursuant to a quid pro quo agreement or contract with the government, without considering whether such an agreement provides the entity's only funding source. *Id.* at 58, 60, 63, 66–67. Accordingly, the Court held that "an

22

entity, like GHP, that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds." *Id.* at 63. Thus, GHP did not constitute a "governmental body" under the PIA and was not subject to the PIA's disclosure requirements. *Id.* at 67 (internal quotations omitted). As the Texas Supreme Court recognized, although "[t]ransperancy, openness, and accountability in the government are all of fundamental importance," "these important policy objectives cannot extinguish the privacy rights properly belonging to private business entities in Texas." *Id.* at 53, 67 ("Transparency is a real concern, to be sure, and the []PIA's liberal-construction mandate reflects the depth of this interest. But liberal construction is not tantamount to boundless reach.").

In the instant case, the evidence shows that the Physicians Network is a non-profit corporation created exclusively for charitable, educational, and scientific purposes, including the "emphasiz[ing] clinical, educational, and scientific aspects of cancer care throughout the State of Texas, the United States, and in foreign countries." Additionally, the Physicians Network's purposes include "[p]roviding health care to the public, including but not limited to the delivery of physician medical services and other health care services," "[s]upporting health care education," and providing grants to conduct research and develop educational programs "to further and improve the ability of health care professionals and

facilities to provide health care services to the public." Thus, the Physicians Network engages in,

> the carrying out of scientific research and research projects in the public interest in the fields of medical sciences, medical economics, public health, sociology, and related areas; the supporting of medical education in medical schools through grants and scholarships; the improving and developing of the capabilities of individuals and institutions studying, teaching, and practicing medicine; the delivery of health care to the public; and the engaging in the instructions of the general public in the area of medical science, public health, and hygiene and related instruction useful to the individual and beneficial to the community.

Notably, the Physicians Network is a separate and distinct entity from the Cancer Center, with its own Certificate of Formation and bylaws. The Physicians Network is managed and controlled by its own board of directors which is composed entirely of physicians engaged in the practice of medicine. And it has its own employees and maintains its own benefits plans for its employees.

The Physicians Network offers four general categories of programs and services to its clients: (1) quality improvement affiliation programs, including its Certified Member Program, (2) an Employer Contracting program, (3) community oncology programs, and (4) strategic advisory and management support services. The purpose of the Physicians Network's Certified Member Program is to "help[] community hospitals located outside of the State of Texas improve the quality of oncology care that those hospitals provide to cancer patients in their respective communities." As part of the Certified Member Program, the Physicians Network

24

"contracts directly with out-of-state community hospitals and provides oncology quality improvement and best practices services" that have been developed by the Physicians Network. These best practices services include "quality evaluation, oncology disease management, quality management, and improvement for oncology services, outcomes measurement and reporting, and peer to peer consultation."

The Certified Member Program includes two phases and two separate contracts: the development phase, governed by a development agreement, and the affiliation phase, governed by a separate affiliation agreement. Initially, the Physicians Network enters into a development agreement with a prospective community hospital, and during the development phase, the Physicians Network "assesses the quality of care provided by the community hospital[] and assists [the] hospital[] in improving any deficiencies to meet the qualification standards for the Certified Member Program." Under the development agreement, a community hospital pays the Physicians Network a fee for the development-phase services that it provides to the community hospital. If the Certified Member Program participant, i.e., a community hospital, meets the Certified Member Program's qualification standards, then the community hospital enters the affiliation phase and signs an affiliation agreement with the Physicians Network.

The Cancer Center is not a party to any of the development agreements, affiliation agreements, or any other contracts that the Physicians Network enters into

25

in connection with its Certified Member Program. The Cancer Center does not receive any payments from the Physicians Network's Certified Member Program, and the Cancer Center does not pay for any services performed by the Physicians Network, any physicians, or any other employees at the community hospitals that are a part of the Physicians Network's Certified Member Program.

Pursuant to its Employer Contracting program, the Physicians Network also provides member services to contracted employers and "professional oncology services to enrollees in the contracted employers' health plans through a provider network." "As compensation, the contracted employers pay [the] Physicians Network a fee for the member services" that it provides. The Physicians Network currently maintains employer contracts with two large international employers.

Related to its community oncology programs, in the Houston area, the Physicians Network employs approximately fifteen oncologists who provide direct patient care to patients in four satellite oncology centers that are owned and operated by the Cancer Center. The Physicians Network employs the oncologists pursuant to quid pro quo contractual arrangements between the Cancer Center and the Physicians Network. More specifically, the Physicians Network and the Cancer Center "have entered into agreements for physician coverage and physicist services, pursuant to which [the] Physicians Network provides employees to [the] Cancer Center in connection with the operation of [the Cancer Center's] satellite oncology

26

centers[,] and in return, [the] Cancer Center reimburses [the] Physicians Network for the costs of employing the physicians and physicists."

The Physicians Network also provides "medical direction services and physics support services for a gamma knife program that is operated at a community hospital in Houston that is not related to or affiliated with [the] Cancer Center." And the Physicians Network "contracts with a private hospital system located in Albuquerque, New Mexico" and provides services, such as employing the radiation oncology physicians and other clinical staff who provide direct patient care to patients at the radiation oncology centers that are owned and operated by the Albuquerque private hospital system.

Finally, the Physicians Network provides "strategic advisory and management support services to [the] Cancer Center" pursuant to a Services Agreement and other contractual arrangements. The Physicians Network and the Cancer Center first entered into a contractual arrangement in 1996, and the current Services Agreement between the Physicians Network and the Cancer Center was signed in 2016. A copy of the current Services Agreement appears in the record. Exhibits to the Services Agreement delineate the services to be provided by the Physicians Network to the Cancer Center and vice versa. The exhibits also address the "[c]ompensation for services" that each entity will receive.

In regard to the Physicians Network's revenue, the evidence shows that the vast majority of the Physicians Network's revenue is derived from its contractual relationships with entities that are not the Cancer Center and not Texas governmental bodies. The Physicians Network has an approximately $66 million operating revenue annually. In 2015, 91.87% of the Physicians Network's annual revenue came from the services it provided to third-party community hospitals, hospital systems, and other private entities, whereas 8.13% of its annual revenue came from services provided to the Cancer Center. In 2016, 92.28% of the Physicians Network's annual revenue came from the services it provided to third-party community hospitals, hospital systems, and other private entities, whereas 7.72% of its annual revenue came from services provided to the Cancer Center. And in 2017, 93.5% of the Physicians Network's annual revenue came from the services it provided to third-party community hospitals, hospital systems, and other private entities, whereas 6.5% of its annual revenue came from services provided to the Cancer Center. The revenue that is received by the Physicians Network from the Cancer Center is a result of certain quid pro quo contracts under which the Physicians Network "provides certain services to [the] Cancer Center and [the] Cancer Center provides certain services to [the] Physicians Network." The Physicians Network "pays more to [the] Cancer Center for the services that [the]

Cancer Center provides than [the] Physicians Network receives from [the] Cancer Center for the services that [the] Physicians Network provides."

Based on the foregoing, we cannot say that the Physicians Network constitutes a private entity that is "sustained" by public funds. *See id.* at 60–61, 63 ("Determining whether a partially funded entity qualifies as a 'governmental body' . . . require[s] [a] case-specific analysis and a close examination of the facts."). In other words, the evidence does not show that the Physicians Network is in a "financially dependent relationship" with a "governmental body" or that the Physicians Network requires public funds to operate in whole or in part. *Id.* at 60–61. Simply put, the Physicians Network does not qualify as an entity that is "supported . . . by public funds" because it is not "dependent on the public fisc to operate as a going concern" and could still perform the same or similar services even without the public funds that it receives from the Cancer Center. *Id.* at 60–61, 63 (internal quotations omitted).

Notably, the Physicians Network resembles GHP, another non-profit corporation, that receives only a small portion of its revenue from its contracts with a "governmental body" and that could continue to operate given the substantial revenue derived from other non-governmental sources. *See id.* at 55, 61, 66–67. Further, as the Texas Supreme Court determined related to GHP, the fact that the Physicians Network receives funds pursuant to quid pro quo agreements or contracts

with the Cancer Center does not automatically render it a "governmental body" under the PIA, especially considering that the compensation the Physicians Network receives from the Cancer Center is not the entity's only source of funding. *See id.* at 58, 60, 63, 66–67. The Physicians Network, like GHP, "does not depend on any particular revenue source to survive" and thus "is not sustained even in part by governmental funds." *Id.* at 63; *see also* Tex Att'y Gen. OR2015-23893 (non-profit corporation and healthcare provider not "governmental body" where approximately "[fifty-five percent] of its funding is from non-public funds" and "it does not depend on public dollars to operate" (internal quotations omitted)); Tex. Att'y Gen. OR2015-15568 (non-profit corporation not "governmental body" even where "roughly half of its total support and revenue was received from public funds" pursuant to contract with governmental entity because corporation "not sustained by public funds" (internal quotations omitted)).

Fallon argues that the Physicians Network is unable to perform its services without public funds because "Texas taxpayers, through [the Cancer Center], pa[y] each member of [the Physicians Network's] [b]oard of [d]irectors an average annual salary of $442,170" or "nearly $4,000,000" in total. Further, "taxpayers paid [the Cancer Center's] President—the person who expressly and legally exercises ultimate control over [the Physicians Network]—nearly $1,500,000 in 2015," and "taxpayers provide well over another million dollars to [the Physicians Network's]

30

executive leadership . . . to run the day-to-day operations of" the Physicians Network. Thus, because "[p]rivate funding could not replace the public funding of [the Physicians Network's] leadership," the Physicians Network must be considered "supported by public funds."[20]

Initially, we note that, in his reply brief, Fallon appears to challenge an affidavit that the Physicians Network attached to its response and cross-motion for summary judgment because "portions of [the] affidavit . . . are inadmissible hearsay" and thus cannot support the Physicians Network's assertion that it is not sustained by public funds. However, the Texas Rules of Appellate Procedure do not allow inclusion of a new issue in a reply brief that was not raised by Fallon in his original brief. *See* TEX. R. APP. P. 38.3; *M Scott Constr., Ltd. v. Mireles*, No. 14-15-00701-CV, 2016 WL 6990046, at *8 (Tex. App.—Houston [14th Dist.] Nov.

---

[20] We note that the Attorney General in his open records letter ruling rejected Fallon's argument that the Physicians Network is unable to perform its services without public funds because Texas taxpayers pay the salaries of the members of the Physician Network's board of directors, the Cancer Center's President, and Physicians Network's executive leadership. *See* Tex. Att'y Gen. OR2016-22964 (finding Physicians Network not sustained by public funds and does not constitute "governmental body" under TIA (internal quotations omitted)); *see also* TEX. GOV'T CODE ANN. § 552.306 ("Rendition of Attorney General Decision; Issuance of Written Opinion"); *Hart*, 382 S.W.3d at 591 ("[I]n construing the PIA, we give due consideration to the Attorney General's PIA decisions, even though they are not binding . . . ."); *Hous. Indep. Sch. Dist*, 798 S.W.2d at 588 (Attorney General PIA decisions should be given great weight by courts, although they are not binding on them).

31

29, 2016, no pet.) (mem. op.); *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Thus, we conclude that Fallon has waived any assertion that the affidavit that the Physicians Network attached to its response and cross-motion for summary judgment should not be considered as evidence supporting the granting of summary judgment in favor of the Physicians Network because the affidavit constitutes inadmissible hearsay. *Mireles*, 2016 WL 6990046, at *8; *McAlester Fuel*, 257 S.W.3d at 737; *see also Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 797 (Tex. App.—Dallas 2013, no pet.) (blanket hearsay objection that does not identify which parts of affidavit contain hearsay is not sufficient to preserve any argument to improper admission or consideration of evidence).

Turning to Fallon's assertions that Texas taxpayers pay the salaries of the members of the Physician Network's board of directors, the Cancer Center's President, and Physicians Network's executive leadership, the evidence shows the members of the Physicians Network's board of directors do not receive "any salary or compensation for their services as [d]irectors."[21] And yet the Physicians Network's bylaws state that the board of directors "shall . . . manage[]" the

---

[21] The Supplemental Financial Statements for "Form 990" of the Physicians Network, which Fallon attached to his summary-judgment motion, confirm such.

32

"property, business, and affairs" of the Physicians Network, and the board "shall exercise all of the powers" of the Physicians Network.

Related to the Cancer Center's president, who, according to the Physicians Network's bylaws, is the "sole [m]ember" of the non-profit corporation,[22] we note that there is no evidence that the Physicians Network's "sole [m]ember" receives any compensation for his role as the "sole [m]ember" of the Physicians Network. *See* TEX. BUS. ORGS. CODE ANN. §§ 22.151(a) (non-profit corporation can be formed with members or without members), 22.152 (members of non-profit corporation not personally liable for obligation of corporation), 252.006 (non-profit association is legal entity separate from its members); *Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (company is legal entity separate from its sole member); *Long Island Owner's Ass'n v. Davidson*, 965 S.W.2d 674,

---

[22] According to the Physicians Network's bylaws, the "sole [m]ember" of the Physicians Network is tasked with appointing and removing directors and performing other duties provided by law, the Physician Network's Articles of Incorporation, and its bylaws. The "sole [m]ember" must approve amendment of the Physicians Network's Articles of Incorporation and its bylaws. However, the "sole [m]ember" is not liable for the debts, liabilities, or obligations of the Physicians Network. *See* TEX. BUS. ORGS. CODE ANN. § 22.152 (members of non-profit corporation not personally liable for obligation of corporation); *Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (company is legal entity separate from its sole member); *Long Island Owner's Ass'n v. Davidson*, 965 S.W.2d 674, 680–81 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) ("As a corporation, LIOA is a legal entity separate from the persons who compose it."); *Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557, 559 (Tex. App.—Texarkana 1992, writ denied) ("A corporation is a separate legal entity, distinct and apart from its members . . . .").

680–81 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) ("As a corporation, LIOA is a legal entity separate from the persons who compose it."); *Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557, 559 (Tex. App.—Texarkana 1992, writ denied) ("A corporation is a separate legal entity, distinct and apart from its members . . . .").

Further, regarding the Physicians Network's executive leadership, the evidence shows that the Physicians Network's executive officers, including the Physicians Network's President and Chief Executive Officer,[23] Vice President and General Counsel, Vice President and Chief Financial Officer, and various Vice Presidents and Associate Vice Presidents, are not Cancer Center employees and are not compensated through the Cancer Center. And to the extent that the Physicians Network's executive leadership or its board of directors, which is largely made up of medical professionals, are also employed by other entities, such salaries received by these medical professionals are unrelated to their service as part of the Physicians Network's executive leadership.[24] *See* TEX. OCC. CODE ANN. § 162.001 (non-profit

---

[23] According to the Physicians Network's bylaws, the President of the Physicians Network "shall be the Chief Executive Officer of the [Physicians Network]." And "shall have general executive charge, management, and control of the properties, business, and operations of the [Physicians Network] with all such powers as may be reasonably incident to such responsibilities." The President "shall have the authority to agree upon and execute all leases, contracts, evidences of indebtedness, and other obligations in the name of the [Physicians Network]."

[24] The Physicians Network's Amended and Restated Certificate of Formation and its bylaws state that each director "shall at all times be a physician duly licensed to

34

health corporation may be certified by Texas Medical Board if its board of directors is composed of licensed physicians and "actively engaged in the practice of medicine"); *see also* 22 TEX. ADMIN. CODE § 177.1(2) (2019) (Tex. Med. Bd., Definitions) ("Actively engaged in the practice of medicine" means "[a] physician on a full-time basis is engaged in diagnosing, treating or offering to treat any mental or physical disease or disorder or any physical deformity or injury or performing such actions with respect to individual patients for compensation . . . . The term 'full-time basis,' . . . shall mean at least [twenty] hours per week for [forty] weeks duration during a given year.").

Finally, we note that Fallon, in his briefing in this Court and in the trial court, generally asserts, without citation to evidence, that "if [the] government funding, which sustains [the Physician Network's] leadership w[as] removed, [the Physicians Network] would not have provision for the most fundamental activities needed to operate." And "[w]ithout taxpayer dollars compensating [the Physicians Network's] sole member and its [b]oard of [d]irectors, [the Physicians Network] would cease to function altogether. Consequently, [the Physicians Network] requires public

---

practice medicine by the Texas State Board of Medical Examiners and shall be actively engaged in the practice of medicine." *See* TEX. OCC. CODE ANN. § 162.001 (non-profit health corporation may be certified by Texas Medical Board if its board of directors is composed of licensed physicians and "actively engaged in the practice of medicine"); *see also* 22 TEX. ADMIN. CODE § 177.1(2) (2019) (Tex. Med. Bd., Definitions) (defining "[a]ctively engaged in the practice of medicine").

funding in order to be able to do anything." Motions, arguments of counsel, and bare assertions are not evidence. *In re DISH Network, L.L.C.*, 563 S.W.3d 433, 439 (Tex. App.—El Paso 2018, no pet.); *St. Paul Mercury Ins. Co. v. Stewart Builders, Ltd.*, No. 01-09-00276-CV, 2011 WL 944377, at \*10 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.); *McCain v. NME Hosps., Inc.*, 856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ).

Based on the foregoing, we conclude that the Physicians Network, a non-profit corporation, is not "sustained" by public funds. *See Greater Hous.*, 468 S.W.3d at 58–63 (internal quotations omitted). This is the same conclusion that the Attorney General reached after considering the same arguments that Fallon later advanced in the trial court and on appeal. *See* Tex. Att'y Gen. OR2016-22964; *see also* TEX. GOV'T CODE ANN. § 552.306 ("Rendition of Attorney General Decision; Issuance of Written Opinion"); *Tex. Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 591 (Tex. App.—Austin 2012, no pet.) ("[I]n construing the PIA, we give due consideration to the Attorney General's PIA decisions, even though they are not binding . . . ."); *Hous. Indep. Sch. Dist. v. Hous. Chronicle Publ'g Co.*, 798 S.W.2d 580, 588 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (Attorney General PIA decisions should be given great weight by courts, although they are not binding on them).

Accordingly, we hold that the Physicians Network, a non-profit corporation, does not constitute a "governmental body" under Texas Government Code section 552.003(1)(A)(xii), which defines a "[g]overnmental body" as "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds." TEX. GOV'T CODE ANN. § 552.003(1)(A)(xii). And the trial court did not err in granting the Physicians Network summary judgment and denying Fallon summary judgment on such a basis.

Because we have determined that the Physicians Network is not "sustained" by public funds, we need not address Fallon's argument that the Physicians Network is the "functional equivalent" of a "governmental body" because it is supported by public funds. *See* TEX. R. APP. P. 47.1.

We overrule Fallon's second issue.

### 3. Related en banc opinion.

We note that in a separate, but related, appeal involving Fallon and the Cancer Center, Fallon challenged the trial court's orders denying him summary judgment and granting the plea to the jurisdiction of the Cancer Center and its Officer for Public Information in Fallon's suit against them for a writ of mandamus and a

37

declaratory judgment.[25] *See Fallon v. Univ. of Tex. MD Anderson Cancer Ctr.*, No. 01-17-00146-CV, slip. op. at 2 (Tex. App.—Houston [1st Dist.] Aug. 27, 2019, no pet. h.).

In that case, Fallon, pursuant to the PIA, sought certain information from the Cancer Center that is similar to the information sought by Fallon from the Physicians Network in the instant case. *See* slip. op. at 2–4. And the central issue on appeal was whether the information requested by Fallon constituted "public information" under the PIA. *See* slip. op. at 14–34 (internal quotations omitted); *see also* TEX. GOV'T CODE ANN. § 552.002(a) (defining "public information" (internal quotations omitted)).

As previously explained, under the PIA, a "governmental body" must promptly produce "public information" on request unless an exception from disclosure applies and is timely asserted. *See* TEX. GOV'T CODE ANN. §§ 552.101–.159, 552.221; *see also Paxton*, 509 S.W.3d at 251; *CareFlite*, 418 S.W.3d at 136.

"[P]ublic information" is defined as follows:

information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business:

(1)    by a governmental body;

(2)    for a governmental body and the governmental body:

---

[25]    *See* TEX. GOV'T CODE ANN. § 552.321 ("Suit for Writ of Mandamus"); TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011 (DJA).

38

> (A)   owns the information;
>
> (B)   has a right of access to the information; or
>
> (C)   spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information; or
>
> (3)   by an individual officer or employee of a governmental body in the officer's or employee's official capacity and the information pertains to official business of the governmental body.

TEX. GOV'T CODE ANN. § 552.002(a) (internal quotations omitted); *Fallon*, slip. op. at 18.[26] "Information is in connection with the transaction of official business if the information is created by, transmitted to, received by, or maintained by an officer or employee of the governmental body in the officer's or employee's official capacity, or a person or entity performing official business or a governmental function on behalf of a governmental body, and pertains to official business of the governmental body." TEX. GOV'T CODE ANN. § 552.002(a-1); *Fallon*, slip. op. at 23. "Official business means any matter over which a governmental body has any authority, administrative duties, or advisory duties." TEX. GOV'T CODE ANN. § 552.003(2-a) (internal quotations omitted); *Fallon*, slip. op. at 23. Whether requested information is "public information" under the PIA is a question of law. *See* slip. op. at 18 (citing

---

[26]   The PIA contains a non-exclusive list of categories of "public information" as well. *See* TEX. GOV'T CODE ANN. § 552.022.

*City of Garland*, 22 S.W.3d at 357; *Harris Cty. Appraisal Dist. v. Integrity Title Co.*, 483 S.W.3d 62, 69 (Tex. App.—Houston [1st Dist.] 2015, pet. denied)).

As explained in the Court's en banc opinion in Fallon's separate appeal, the parties did not dispute that the requested information sought by Fallon from the Cancer Center was information related to the Physicians Network's Certified Member Program and that the requested information was not in the possession of the Cancer Center. *See Fallon*, slip. op. at 19–20. Thus, under the PIA, Fallon asserted that the information that he sought was "public information" because it was "written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . for a governmental body," i.e., the Cancer Center, and the "governmental body," i.e., the Cancer Center, "ha[d] a right of access to the information." *See* slip. op. at 4–5, 8–9, 21–34; *see also* TEX. GOV'T CODE ANN. § 552.002(a)(2)(B).

In determining whether the trial court erred in granting the Cancer Center's plea to the jurisdiction because the information sought by Fallon was indeed "public information," we first considered whether the Cancer Center had proved, as a matter of law, that the Physicians Network does not maintain responsive information "in connection with the transaction of official business" of the Cancer Center. *See Fallon*, slip. op. at 23–27 (internal quotations omitted); *see also* TEX. GOV'T CODE ANN. §§ 552.002(a), (a-1), 552.003(2-a). The Cancer Center argued that the

40

Physicians Network did not maintain information responsive to Fallon's public information request "in connection with the transaction of official business" of the Cancer Center because: (1) the Physicians Network constitutes a "separate legal entity" from the Cancer Center, (2) the Physicians Network is not a "governmental body," and (3) the Physician's Network's Certified Member Program "is not the official business" of the Cancer Center. *See Fallon*, slip. op. at 23–24 (internal quotations omitted).

Although we ultimately concluded that the Cancer Center had failed to establish, as a matter of law, that the information responsive to his public information request and in the possession of the Physicians Network was not "in connection with the transaction of official business" of the Cancer Center, we did conclude that the Cancer Center had established that the Physicians Network was a "separate legal entity" from the Cancer Center and that the Physicians Network *did not* constitute a "governmental body." *See* slip. op. at 23–27 (internal quotations omitted). Our holding in the instant case that the Physicians Network does not constitute a "governmental body" under Texas Government Code sections 552.003(1)(A)(i) and 552.003(1)(A)(xii) is in line with our conclusion in Fallon's separate, but related, appeal. *See* slip. op. at 24.

41

**B.** **Non-Governmental Body and Obligations under PIA**

In his third issue, Fallon argues that, regardless of whether the Physicians Network constitutes a "governmental body" under the PIA, it "must still make public information available to [him] because he seeks information owned by [the Cancer Center], that [the Cancer Center] has a right [of] access [to], and [the] storage [of the information] is paid for by public funds."

"[P]ublic information" is defined as:

information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business:

(1)    by a governmental body;

(2)    *for a governmental body and the governmental body*:

(A)    *owns the information*;

(B)    *has a right of access to the information*; or

(C)    *spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information*; or

(3)    by an individual officer or employee of a governmental body in the officer's or employee's official capacity and the information pertains to official business of the governmental body.

TEX. GOV'T CODE ANN. § 552.002(a) (emphasis added). Thus, Fallon asserts that the Physicians Network is obligated to produce his requested information pursuant to the PIA because the information that he seeks is owned by the Cancer Center, the

42

Cancer Center has a right of access to the information, and the Cancer Center pays or contributes public funds for storing of the information. We note that Fallon cites no authority, other than the statutory definition of "[p]ublic information," to support his assertion that the Physicians Network must disclose his requested information even though we have held that it does not constitute a "governmental body" under the PIA. *See* TEX. R. APP. P. 38.1(i).

The purpose of the PIA is to provide the public with "complete information about the *affairs of government* and the official acts of public officials and employees." TEX. GOV'T CODE ANN. § 552.001(a) (emphasis added); *Jackson*, 351 S.W.3d at 293 (internal quotations omitted); *see also Paxton*, 509 S.W.3d at 251 (fundamental precept of PIA is that "[t]he people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know" (alteration in original) (internal quotations omitted)); *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243–44 (Tex. App.—Austin 2016, no pet.) (PIA "reflects the public policy that the people of Texas remain[] informed so that they may retain control over the instruments they have created" (alteration in original) (internal quotations omitted)); *Thomas v. El Paso Cty. Cmty. Coll. Dist.*, 68 S.W.3d 722, 726 (Tex. App.—El Paso 2001, no pet.) (PIA "reflects the state policy that the public is entitled to have access to the information on *government affairs and officials acts*" (emphasis added)). Thus, under the PIA,

it is a "*governmental body*" that must promptly produce "public information" on request unless an exception to disclosure applies and is timely asserted. *See* TEX. GOV'T CODE ANN. §§ 552.101–.159, 552.221 (emphasis added); *see also Paxton*, 509 S.W.3d at 251; *CareFlite*, 418 S.W.3d at 136. And only if a "*governmental body*" fails to disclose the requested public information, does the requestor have a method of enforcing his statutory right by suing for a writ of mandamus to compel the "*governmental body*" "to make [the] information available." TEX. GOV'T CODE ANN. § 552.321(a) (emphasis added); *see also City of Hous. v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 583–84 (Tex. 2018); *Nehls v. Hartman Newspapers, LP*, 522 S.W.3d 23, 29 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Cooper*, 254 S.W.3d at 694.

As the Texas Supreme Court has explained: "[A]n entity's disclosure obligations under the []PIA hinge on whether it is in fact a governmental body." *Greater Hous.*, 468 S.W.3d at 57, 67 (internal quotations omitted) (holding non-profit corporation did not constitute "governmental body" and not subject to "invasive disclosure requirements" under PIA (internal quotations omitted)); *see also CareFlite*, 418 S.W.3d at 142 (because entity "not a governmental body," it was "not subject to []PIA"); *Keever v. Finlan*, 988 S.W.2d 300, 305 (Tex. App.—Dallas 1999, pet. dism'd) (person not "governmental body" and therefore not subject to PIA (internal quotations omitted)); *Blankenship v. Brazos Higher Educ. Auth., Inc.*, 975

44

S.W.2d 353, 362 (Tex. App.—Waco 1998, pet. denied) (because non-profit corporation not "governmental bod[y]," PIA did not apply and no duty to provide requested information). After all, the PIA does not have a "boundless reach." *Greater Hous.*, 468 S.W.3d at 67.

Because we have held that the Physicians Network is not a "governmental body" under the PIA, we further hold that it is not subject to the disclosure obligations of the PIA and Fallon is not entitled to seek mandamus relief against the Physicians Network to compel it to make the information he requested available under the PIA.[27] *See Keever*, 988 S.W.2d at 305 (relevant inquiry not whether information sought was "public information," but rather whether entity from whom information was sought constituted "governmental body" and thus subject to PIA; where entity not "governmental body," requestor could not seek mandamus relief to compel it to make information available under PIA (internal quotations omitted));

---

[27] Our holding in this case does not preclude Fallon from seeking "public information" from a "governmental body," such as the Cancer Center. *See Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 67 (Tex. 2015) (although non-profit corporation did not constitute "governmental body" under PIA and not required to disclose requested information, nothing prevented requestor from seeking "public information" from governmental entity directly (internal quotations omitted)); *see also See Fallon v. Univ. of Tex. MD Anderson Cancer Ctr.*, No. 01-17-00146-CV, slip. op. at 42 (Tex. App.—Houston [1st Dist.] Aug. 27, 2019, no pet. h.) (reversing and remanding "Fallon's suit for a writ of mandamus to compel the Cancer Center to produce information responsive to his public information request").

*Blankenship*, 975 S.W.2d at 362 (because non-profit corporation not "governmental bod[y]," PIA did not apply and no duty to provide requested information).

We overrule Fallon's third issue.

Due to our disposition of Fallon's first, second, and third issues, we need not address Fallon's fourth issue in which he argues that the trial court erred in denying him summary judgment because the Physicians Network presented no evidence of any applicable exceptions to disclosure that may be invoked by a "governmental body" under the PIA. *See* TEX. R. APP. P. 47.1; *see, e.g.*, TEX. GOV'T CODE ANN. §§ 552.101–.159 ("Information Excepted from Required Disclosure"). Fallon's fifth issue, in which he globally asserts that the trial court erred in granting the Physicians Network summary judgment and denying him summary judgment, is subsumed in our discussion of his first, second, and third issues. *See* TEX. R. APP. P. 47.1. Finally, to the extent that Fallon asserts that he is not "collaterally estopped from making his arguments" in the instant case, due to our disposition of Fallon's first, second, and third issues, we need not address this assertion. *See id.*

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.